IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES | § § § § | |
| Plaintiffs, | § § | Civil Action No. 5:17-CV-1295 |
| v. | § § | JURY TRIAL DEMANDED |
| QUEST DIAGNOSTICS, INC. | § § | |
| Defendant. | § § | |

## COMPLAINT

Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Biologics, LLC d/b/a United Allergy Services ("UAS) (collectively "Plaintiffs") file this action against Quest Diagnostics, Inc. ("Quest" or "Defendant").

## NATURE OF THE CASE

1.      This is a case of an ongoing conspiracy between dominant players in the allergy testing and immunotherapy markets throughout the United States to eliminate competition by a class of lower cost competitors. Quest, the largest reference laboratory provider of allergy blood tests in the United States, agreed to work with other established interests in the market to eliminate competition caused by UAS through the expansion of allergy skin testing and immunotherapy at the primary care level. The anticompetitive agreement included obtaining and misappropriating UAS's confidential and proprietary customer list and falsely claiming to those and other potential customers that doing business with UAS caused medical, legal, and other risks. The agreement also included convincing certain health insurance companies not to pay or otherwise reduce payment for allergy skin testing and allergen immunotherapy from these

competitors, including through wrongful exclusionary and coercive tactics such as claiming such services were substandard, fraudulent, or otherwise risked unfounded liability.  The goal of this conduct was not only to increase Quest's and its co-conspirator's market share, but also to divide and monopolize the market and protect and increase their monopoly power in certain local markets throughout the United States.   The result of Quest and its co-conspirators' anticompetitive conduct has significantly damaged competition and consumers through a reduction of output and higher prices caused by an elimination or reduction of lower cost services in certain local markets throughout the United States, damaging UAS more than $200 million in the process.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

2.      This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Comm. Code § 15.05, Tex. Civ. Prac. & Rem. Code § 134A, and the common law of torts for civil conspiracy, and tortious interference with both current contracts and prospective business relations.

3.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1367(a).  Service of process may be made upon a corporation not only in the jurisdiction where it is an inhabitant, but also in any district it may be found or transacts business.  *See* 15 U.S.C. § 22.

4.      The Court may exercise personal jurisdiction over Quest because it has continuous and systematic business contacts with Texas that are substantial, and because this action arises out of and is related to those purposeful contacts with Texas.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Quest inhabits or transacts business in this District and a substantial part of the events or omissions giving rise to these claims occurred in this District, including, but not limited to, the

2

conspirators' attempts to organize a group boycott and restrict competition and output using insurance companies, managed care organizations, and physicians located in this district to harm UAS, which is also located in this District.  In addition, venue is proper in this District pursuant to 15 U.S.C. § 22 because Quest transacts business in the District.

6.     Quest and its co-conspirators' conduct, including their attempts to organize a group boycott against and restrict competition and output from non-allergist physicians and their businesses and support staff, including AAAPC members and UAS, their conspiracy to monopolize the market for allergy testing and allergen immunotherapy, and their tortious interference with AAAPC members and UAS's contracts and prospective business relations all cross state lines.  Quest and its co-conspirators' activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate commerce.

## PARTIES

### Plaintiffs

7.     AAAPC is a 503(C)(6) non-profit organization of over 250 member physicians with its principal place of business in Washington, the District of Columbia.  AAAPC is an organization that fosters the ability of primary care physicians to provide high quality, patient accessible diagnostic and therapeutic allergy and asthma care.  Part of AAAPC's purpose is to represent the interests of over 2,000 primary care physicians that provide allergy and asthma care to their patients, including the ability to practice in the market for allergy testing and allergen immunotherapy in local areas throughout the United States.  AAAPC seeks injunctive relief on its antitrust claims brought in a representational capacity on behalf of its members.  It has standing to bring these claims on behalf of its members to protect their interests, as those members would have standing to sue individually, but are not necessary parties to this suit.

AAAPC also seeks certain money damages in its own capacity because it has, itself, suffered actual damages due to Quest and its co-conspirators' tortious conduct through its interference with AAAPC's contracts and existing and prospective business relations.   AAAPC hereby appears through undersigned counsel in this cause.

8.     United Biologics, LLC d/b/a United Allergy Services is a Delaware limited liability company with its principal place of business in San Antonio, Bexar County, Texas, in the Western District of Texas.   UAS participates in the market for allergy testing and allergen immunotherapy through providing support services for physicians practicing allergy testing and allergen immunotherapy in local areas within Texas and 24 other states.   As a result, UAS and the primary care and other physicians UAS supports, compete directly with the businesses of Quest, Thermo Fisher Scientific, Inc. ("Thermo Fisher"), and board-certified allergists.   As a direct target of Quest's activities to eliminate UAS from the markets for allergy testing and allergen immunotherapy, and thus reduce competition in those markets, UAS has standing to seek treble damages and injunctive relief under the Clayton Act in addition to standing for its other claims.   UAS hereby appears through undersigned counsel in this cause.

**Defendant**

9.      Quest Diagnostics Incorporated is a Delaware corporation with its principal place of business at 3 Giralda Farms, Madison, New Jersey 07940, and may be served through its registered agent for service of process located at Corporation Service Company d/b/a CSC, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218. Quest conducts its business through its headquarters and through its laboratories, patient service centers, offices, and other facilities around the United States, including San Antonio, and in select locations outside of the United States.

10.      Quest and its co-conspirators' acts detailed herein were authorized, ordered, and/or done by them or their organizations, businesses, officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## BACKGROUND

11.      This case is about the treatment of seasonal and perennial allergies by primary care and family physicians for their patients. When family physicians and primary care providers started offering these services in conjunction with UAS, competitors started to notice. And when patients began using their own primary care and family doctors working with UAS instead of the competitors' products—including 1) by using one type of allergy test over another product and, 2) receiving allergy testing from primary care physicians instead of through specialists like board-certified allergists—those competitors decided to conspire to eliminate competition from UAS. In this case, the largest reference laboratory in the United States, Quest, colluded with the largest manufacturer of allergy blood tests, Phadia—along with many other co-conspirator competitors including board-certified allergists and their businesses and trade associations—to exclude UAS and the physicians in contract with it from the market.

12.     Many physicians have historically treated patients for allergy-related symptoms, especially in treating aero-allergies and mold allergies, otherwise known as seasonal and perennial allergies. These physicians, who include board-certified pediatricians, board-certified family physicians, board-certified otolaryngologists ("ENTs"), and other specialists and primary care physicians, have practiced allergy care long before the creation of American Board of Allergy and Immunology in 1971. The ABAI only qualifies physicians who are already board-certified in either pediatrics or internal medicine and who participate in a three-year fellowship in an ABAI training program (the physicians so qualified by ABAI are herein referred to as "board-certified allergists"). Currently there are fewer than 3,000 board-certified allergists and the number of fellowships and board-certified allergists is shrinking. It is estimated that currently 50-60 million Americans are affected by allergic rhinitis, which is one of the fastest growing health care epidemics in the United States. Unfortunately, though, only 2-6% of the population receive immunotherapy, a treatment that actually treats the underlying cause of allergies unlike pharmacopeia and other drugs which merely masks a patient's symptoms.

13.     And while the number of physicians who receive ABAI accreditation is shrinking, board-certified allergists and their businesses wield considerable influence in the markets for allergy testing and allergen immunotherapy.  Almost every practicing board-certified allergist is in the business of allergy skin testing and allergen immunotherapy.  Collectively, board-certified allergists as a group participate in more allergen immunotherapy than any other player in the market. But since there are fewer than 3,000 of them in the United States, and 50-60 million people are affected by allergic rhinitis, the dominant players in the immunotherapy market—board-certified allergists—cannot possibly treat the epidemic.

14.     Enter UAS. In 2009, United Biologics, LLC was formed and began doing business in San Antonio, Texas under the name "United Allergy Labs" or "UAL."  UAL's business model represented a response to the shortage of physicians who practiced allergy testing and allergen immunotherapy despite the growing need for those services.  Though some family physicians and other primary care physicians practiced allergy testing and allergen immunotherapy, most did not based on the large economic barrier to entry into the market. Providers must purchase and stock the necessary allergy testing equipment and antigens for immunotherapy, as well as train and maintain technicians to assist in administering tests and preparing immunotherapy. These expenses normally prevent most primary care physicians from providing allergy testing and allergen immunotherapy. UAS was formed to help primary care physicians and their businesses overcome this economic barrier by contracting with those businesses to assist those business's entry into the market.

15.     UAS contracts with medical providers, including primary care and family physicians, to provide the equipment and non-physician technician services necessary to facilitate the treatment of allergy skin testing and immunotherapy in a cost-effective manner. In exchange for these services, the provider pays UAS a set fee. Since 2009, UAS has assisted more than 2,000 primary care providers of allergy testing and allergen immunotherapy across 29 states to enter the market for allergy testing and allergen immunotherapy.

16.     When a physician works with UAS—overcoming the barriers of entry into the market for allergy testing and allergen immunotherapy—that provider is able to treat his or her patients more effectively. The only known potential cure or actual treatment of allergic rhinitis for seasonal and perennial allergies is allergen immunotherapy, a process of introducing allergens incrementally into the patient's system to desensitize the patient to such allergens.

Physicians who provide care through allergen immunotherapy do so by first testing the patient for allergies through use of a skin prick test or an allergy blood test. Before the entry of UAS into the market, primary care physicians often would refer patients with seasonal and perennial allergies to Quest and other reference laboratories for allergy blood testing or to board-certified allergists for allergy skin testing and immunotherapy. With the entry of UAS, however, primary care physicians began utilizing the skin prick test in their own offices with the assistance of UAS, removing the referral to Quest and board-certified allergists. This cost-effective and more accessible system threatened these competitors' referral network from primary care physicians.

17.     Quest is a reference laboratory that relies on referrals from physicians to perform diagnostic tests for their patients. Quest works with Phadia, Inc., a company that manufactures and sells ImmunoCAP tests, otherwise known as "ImmunoCAP" or "ICAPs" to sell and promote allergy blood tests. Phadia was purchased by Thermo Fisher Scientific, Inc. in 2011, and is now referenced as the ImmunoDiagnostics Division of Thermo Fisher.[1] ImmunoCAPs originated as a form of Radio Allergo Sorbent Tests ("RAST tests"), which is a blood test that measures levels of Immunoglobulin E (IgE), the allergic antibody, in an effort to test for allergies. While ImmunoCAPs are used by board-certified allergists primarily to test for food allergies, Phadia promotes ImmunoCAPs to primary care physicians and encourages those physicians to refer those patients to reference laboratories such as Quest for allergy testing for seasonal and perennial allergies, and to refer those patients who test positive to board-certified allergists for immunotherapy.

18.     Headquartered in Madison, New Jersey, Quest is the largest supplier of clinical laboratory testing services in the United States, performing diagnostic testing and laboratory

---

[1]   The terms Phadia and Thermo Fisher are used interchangeably by both Quest representatives and Thermo Fisher representatives.

analysis. It possesses the world's largest database of clinical lab results, as it serves half of all physicians and hospitals in the United States. Quest offers physicians the broadest test menu of over 3,000 tests and annually serves one in three adult Americans. It operates laboratories in most major metropolitan areas, in Mexico, in the United Kingdom, and in India, including four esoteric laboratories, 40 outpatient AP laboratories, and 160 smaller, rapid-response laboratories. It also has approximately 2,200 patient service centers.  Quest is the largest independent lab segment in the United States. Quest's currency-adjusted revenue, for example, increased in 2016 by 2.6% to $7.52 billion.  On a typical workday, testing is performed by Quest for about 550,000 patients.

19.     Quest has three main sources of business: 1) Reference testing; 2) Hospital Outreach, and 3) Inpatient Services. Quest is the dominant player in the United States for laboratory reference testing, and this case is about Quest's dominant market share of allergy testing and its conspiracy and attempts to monopolize all allergy testing markets. Quest is the leader in reference laboratory market share in all areas, not just in allergy testing. Quest enjoys at least 67% of market share in Northern California, for example, based on exclusionary practices described below—and it enjoys the same market dominance across the country.

20.     In the same way Quest is the largest reference laboratory in the United States, Phadia is the largest manufacturer and dominant player for allergy blood tests. Thermo Fisher, a laboratory equipment manufacturer with its headquarters in Waltham, Massachusetts, has revenues of $17 billion. Thermo Fisher purchased Phadia, a Swedish diagnostics company, in 2011 for $3.5 billion as a major step forward in Thermo's strategy to enhance specialty diagnostics on one of its key growth platforms. Phadia manufacturers approximately 85-90% of the allergy blood tests sold in the United States, with Quest providing the large majority of those

tests, and consequently has maintained for years a dominant position in the allergy testing market.  Through its partnership with Phadia, Quest owns more than 50% of allergy testing in numerous markets throughout the United States. Quest has used this dominant position in the allergy testing market and other markets to wrongfully coerce and influence medical providers, payors, and its own competitors to exclude others including UAS from the market for allergy testing.

21.     When Thermo Fisher bought Phadia to enhance its key growth platforms, Phadia and Quest enjoyed a collaborative relationship working together to sell ImmunoCAPS. At the grass roots level, Phadia uses clinical sales consultants ("CSCs") who call on providers to educate and encourage medical practices to use ImmunoCAPS for their patients with allergy-related symptoms. Those CSCs report to their district manager, and the district managers report to the National Sales Director, among other people, and the rest of the executive leadership team. Similar to Phadia's sales hierarchy, Quest uses account sales representatives, who are now referred to as physician account executives ("PAEs"), who report to district sales managers, and then the executive sales director for that district. Phadia CSCs and Quest PAEs work together often to collaborate and visit physicians together to enhance sales.

## THE PRODUCT & GEOGRAPHIC MARKETS FOR ALLERGY TESTING AND ALLERGEN IMMUNOTHERAPY

22.     To compete in the market for allergy testing and allergen immunotherapy, firms rely on physicians licensed in that particular state to practice medicine, technicians for which there is no licensing process in most states, and other employees, who either administer or participate in the testing or immunotherapy preparation.  The firms must also purchase all necessary equipment to compete, including skin prick test kits, antigens, vials, needles, instruments, and other materials necessary to perform allergy testing and preparation of allergen

immunotherapy.  The firms must also be paid for the services performed, either by the patient directly, or by a "third-party payor," such as a commercial health insurance company, a managed care health plan, Medicare, or Medicaid.  Approximately 98% of the services for allergy testing and allergen immunotherapy are paid for at least in part by third-party payors, and those services are billed to those third-party payors under agreements or regulations that require submissions in accordance with the Current Procedural Terminology ("CPT") code set maintained by the American Medical Association.  Currently, there is no substitute for either allergy testing or allergen immunotherapy in effectively diagnosing or treating seasonal or perennial allergies.

23.    During the diagnosis of a patient with seasonal and perennial allergies, the physician performs a physical examination of the patient, and based on that examination and the patient's medical history, may recommend to the patient a skin prick test.  If the patient consents, the skin prick test is typically applied by a technician to the patient's skin at the direction of the physician.  The test is made up of small amounts of antigen that correspond to clinically relevant allergens for a specific region.  The skin reacts to the allergic materials contained on the test, and the technician usually measures and records the size of the reaction, and the physician reviews the results.  If a firm bills a third-party payor for a skin prick test, the firm does so under CPT Code 95004.

24.    Alternatively, some physicians may refer a patient with seasonal and perennial allergies for an allergy blood test at a reference laboratory instead of performing skin prick test in the physician's office. When the physician recommends an allergy blood test, the physician refers the patient to a reference laboratory like Quest, which draws the patient's blood and applies an instrument, such as ImmunoCAP, which is manufactured by Phadia.  The physician prescribes the patient an ImmunoCAP allergy blood test, either by a regional profile of allergens

or occasionally through the physician choosing individual allergens. Phadia determines regional profiles based on the area of the country and the allergens that patients are consistently allergic to in that area. Regional panels are normally 28-30 allergens, and for seasonal and perennial allergies, the panel would be the environmental panel for that region. In Texas, for example, the regional panel includes pollens, danders, grasses, molds, and cockroach. The patient then visits the reference laboratory, either in the physician's office or in a service center, to have his or her blood's drawn for the test. Quest processes the patient's blood and sends the results back to the physician. Quest and other reference laboratories, such as Clinical Pathology Labs ("CPL"), and Laboratory Corporation of America ("LabCorp"), bill third-party payors under CPT Code 86003. The cost for a regional panel is approximately $900 per patient, which is more than triple the cost of a standard panel for an allergy skin test associated with the same region.

25.     Allergy testing, through either a skin test or a blood test, as described above, is a necessary prerequisite for a patient to be considered for allergen immunotherapy. If the physician determines that a patient is allergic to an allergen through testing, the physician may recommend allergen immunotherapy to the patient.  Should the physician deem it appropriate to place the patient on allergen immunotherapy and the patient consents to the treatment, the allergen immunotherapy is typically prepared by a technician under the physician's supervision.  The allergen immunotherapy is composed of antigens that are mixed with a diluent.  The mixture is then diluted into serial dilution vials for administration to the patient starting with the lowest concentration and progressing to the highest concentration, called a "maintenance dose."  If a firm bills a third-party payor for the preparation of allergen immunotherapy, the firm does so under CPT Code 95165.

26.    The most common form of administration of allergen immunotherapy in the United States is through the use of subcutaneous shots, otherwise known as "SCIT" or "allergy injections."  If a firm bills a third-party payor for the administration of SCIT or allergy shots, the firm does so under CPT Code 95115 for a single injection or 95117 for two or more injections if those injections are administered in the office by a technician.  Many physicians in their own professional judgment allow some of their patients to self-administer allergy shots outside of the office, particularly those patients who demonstrate a low risk of side effects and who would benefit from the increased rate of compliance and lower costs that are associated with self-administration.  Historically and today, a majority of physicians who prescribe allergen immunotherapy for their patients recommend patient self-administration in appropriate cases.  Self-administration is a safe and effective method for certain patients and is also less expensive, because the patient and their insurer are not billed for shot administrations that the patient self-administers and the patient does not have to travel to the physician's office every week.

27.    Most board-certified allergists, however, routinely require the patient to visit their office for allergy shots, which means that a patient will have to travel to a board-certified allergist's office two times a week, and for up to three years of immunotherapy treatment. Board-certified allergists also charge for shots and bill the patients or their insurance company, significantly raising the price for the patient and for the payor.

28.    Given travel cost and time considerations for the treatment of seasonal and perennial allergies, there is a limit to how far patients will typically travel for allergy testing and allergen immunotherapy.  The area of effective competition, and hence the geographic scope of the market for allergy testing and allergen immunotherapy from the patient side, therefore tends to be relatively localized.  Allergy treatment services are offered in all major cities in the country

13

and in some smaller cities as well. Geographic market boundaries for a relatively localized market are similar to boundaries of cities, as patients will commonly travel within a city but not from one city to another.  Because patients typically seek medical care close to their homes or workplaces, they strongly prefer health care services, including allergy testing and allergen immunotherapy, close to their homes and workplaces.  The most common method to determine the localized areas where patients travel for such services is use of Core Based Statistical Areas (CBSAs).  The economic reality of receipt of these services dictates these boundaries. It is not typically economically feasible for a patient to travel to another CBSA for non-ambulatory services such as allergy testing and allergen immunotherapy given the economic tangible and intangible costs involved with such travel. For example, a patient in Houston is highly unlikely to travel to Dallas just to obtain an allergy test or allergen immunotherapy. While the market may be a local one, Quest and its co-conspirators' actions are aimed at foreclosing an entire class of competitors and Quest and its co-conspirators have attempted to impact localized markets in which they practice, including for example, every localized market in Texas.

## INCREASE IN COMPETITION IN THE RELEVANT MARKET

29.     Most specialists, including board-certified allergists, are typically located in large urban or wealthy suburban areas.  This shortage has left rural and poor urban areas largely without access to allergy testing and allergen immunotherapy.  In addition to location, cost is an issue as well.  The high cost of these treatments also decreases the ability of poor and rural patients to receive the necessary treatments, as does the requirement by most board-certified allergists that patients travel to and pay for shot administration in the office. Quest and Phadia work with primary care physicians, specialists, and other providers in rural and urban areas, but

if a patient tests positive for an allergy blood test, that patient is then referred to a specialist and must travel longer distances, wait longer for an appointment, and pay a higher co-pay.

30.     UAS and the primary care physicians with whom it contracts, working together offer a more cost-effective and accessible program for rural and lower income patients. As part of the contractual relationship between UAS and physicians, practice groups, and hospitals, UAS is responsible for all of the non-physician services necessary to compete in the market for allergy testing and allergen immunotherapy, including the technicians, allergy testing kits, antigens for immunotherapy mixing, and other materials that UAS purchases from the established suppliers in the industry.  UAS trains its technicians to assist physicians in the medical practice of allergy testing and allergen immunotherapy.  Those technicians are located by UAS, and are required to meet more rigorous standards than the technicians typically relied on by the businesses of board-certified allergists, including engaging and passing a program concerning allergy testing and allergen immunotherapy administered by the University of the Incarnate Word School of Nursing.  Physicians rely on the services of UAS employed-technicians to personally provide allergy care to the patients that the physician determines may benefit from this treatment.  This includes the physician supervising the provision of and reading the allergy test, consulting the patient on the potential for allergen immunotherapy in response to positive test, and supervising the preparation of antigens for treatment through allergy shots for patients who are amenable and have consented to treatment.

31.     Together, primary care physicians and UAS have provided a less expensive and more widely available alternative for consumers than Quest and Phadia and the businesses of board-certified allergists in the markets for allergy testing and allergen immunotherapy.  The entry of at least 2,000 additional primary care physicians since 2009 in the relevant geographic

markets of 25 states, including Texas,[2] for allergy testing and allergen immunotherapy has begun to address the 94-98% of allergy patients who could benefit from allergen immunotherapy but currently go untreated.  Those patients who have been permitted to self-administer their allergy shots have also benefitted in reduced cost by not being charged as often for shot administration, or from not incurring the expense of taking off work to travel to a physician's office to be administered allergy shots.

33.    Third-party payors, especially commercial carriers, have also benefitted from this lower-cost option of competitors.  Lower reimbursement rates for primary care physicians as compared to specialists result in a significantly lower cost for allergy testing as billed under CPT Code 95004, the preparation of allergen immunotherapy as billed under CPT Code 95165, and a significant lessening or removal of costs billed for allergy shots under CPT Codes 95115 and 95117.  Additionally, the system as a whole has benefitted from the increased utilization of allergen immunotherapy, which studies have shown reduces the overall costs to patients and the health care system in terms of expenses for medication, office visits, and hospital visits for more chronic conditions that develop when the patient goes untreated by allergen immunotherapy.

33.    Nevertheless, when Quest and Phadia noticed the impact of UAS and physicians providing skin prick testing and immunotherapy in their offices, Quest and Phadia began working together and with other competitors to stop the competitive threat. Together they visited physicians' offices and used anticompetitive strategies to convince physicians and practice groups not to do business with UAS and eventually elevated the threat to leadership—where

---

[2]   UAS has contracted with physicians in 25 states, including Texas, Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia. The CBSAs applicable to those states can be found at http://www.census.gov/population/metro/data/def.html.

Quest and Phadia strategized to craft significant nationwide changes to reimbursement policies and company-wide training of its sales representatives to have ammunition to combat the threat when visiting physicians' offices.

34.     At the same time Quest and Phadia began conspiring against UAS and the physicians in contract with UAS, they also agreed and worked with competitors who were similarly motivated to exclude UAS and similar competitors from the market. Quest and Phadia worked with the three national allergist trade associations, certain of their officers and board members, and a nonprofit organization paid for and acting as the front organization for the conspiracy, the Allergy and Asthma Network, Mothers of Asthmatics ("AANMA").  The three trade associations, the American Academy of Allergy, Asthma & Immunology ("AAAAI"), the American College of Allergy, Asthma & Immunology ("ACAAI"), and the Joint Council of Allergy, Asthma & Immunology ("JCAAI"), responded to pleas from their members to engage in a "turf war" to address the "encroachment" in the market by primary care physicians and UAS.  In response, and in keeping with the "turf war" motif, these three independent associations of competitors agreed to form "RADAR," a joint venture of those organizations to recruit local allergists from every state, regional, and local allergist society in the nation to fight back against these competitors, and to provide a message board called "Basecamp" for those representatives to coordinate their anticompetitive activities.   The co-conspirators contacted insurance companies, managed care organization health plans, and other third-party payors to convince them not to do business with or reimburse the allergy testing and allergen immunotherapy services of primary care physicians and UAS.  They also used AANMA for the conspiracy under the guise that no one would challenge an organization with a now faux purpose of protecting children.

35.     Quest and its co-conspirators engaged in this conduct despite governmental organizations such as the Centers for Medicare and Medicaid Services and the Texas Medical Board, which otherwise pay for and authorize the services of these competitors.  The purpose of Quest's contacts with third-party payors and the encouragement of other members to engage in this behavior is to accomplish their anticompetitive objectives through misrepresentations that included persuasion, enticement, or coercion, and were economically motivated to protect Quest and Phadia's, among the other co-conspirators' turf over allergy testing and immunotherapy.

36.     The result has been a threatened and actual restriction on competition in the market for allergy testing and allergen immunotherapy to the ultimate detriments of consumers. By attempting to take away competitors' means to compete, namely reimbursement by third-party payors, and by intimidating physicians by threatening them with claims of fraud or insurance company audits, Quest has aimed to deprive the market of a lower cost alternative and deprive patients of the ability to choose which businesses and physicians may provide allergy testing and allergen immunotherapy.  Quest's and its co-conspirators' intended result is to protect their profits and dominance in the market, and ensure that patients continue to pay the inflated prices of allergy blood tests, and allergy skin testing and immunotherapy performed by board-certified allergists, despite the availability of competing cheaper alternatives and the need for additional supply in the market.

37.     In 2014, Plaintiffs filed a lawsuit against certain board-certified allergists, their businesses, and their trade associations because Plaintiffs experienced difficulties with payors who initiated harassing audits after hearing about a false standard of care from those specialists and threatened to enact illegal policies that would restrict access to care. Board-certified allergists and their trade associations smeared Plaintiffs while coercing payors that they should

be concerned about reimbursing allergy testing and immunotherapy those allergists falsely characterized as dangerous, substandard, or fraudulent. Then, in discovery, Plaintiffs unearthed additional actors in the conspiracy, including AANNMA, Phadia, and others who represented an aligned but hidden interest of promoting referrals for allergy blood tests and joined the conspiracy to exclude UAS as a competitive threat. Then in the ongoing case against AANMA and Phadia, and only then, Plaintiffs discovered that Quest, the largest reference laboratory in the country and the largest provider of allergy testing, worked with Phadia and others to exclude UAS and primary care physicians from allergy skin prick testing and immunotherapy. Now Plaintiffs file this action to put a stop to this continuing anticompetitive campaign against UAS and primary care physicians offering this treatment.

38.     When Quest joined the conspiracy, Quest and its co-conspirators were well situated as the dominant actors in the market to erect significant barriers against primary care physicians and UAS through anticompetitive means of excluding them from the market. Board-certified allergists have the power to influence the markets for allergy testing and allergen immunotherapy through their trade organizations. As the national organizations of board-certified allergists, the AAAAI, the ACAAI, and the JCAAI both individually and jointly are dominant players in the markets for allergy testing and allergen immunotherapy.  AAAAI, ACAAI, and JCAAI, which collectively represent virtually every board-certified allergist in the United States, publish and control the most respected medical journals related to allergy care, and distribute influential allergy practice guidelines that, if misunderstood or misused, can change the shape of the marketplace for allergy-related services.

39.     Additionally, based on their significant market share, Phadia and Quest have market power, which gives them the ability to influence the markets for allergy testing and

allergen immunotherapy both through their massive corporate reach and their decision to work with board-certified allergist competitors to achieve their mutual anticompetitive goals. Furthermore, along with the board-certified allergists and their national trade associations with which Quest and Phadia conspired, they jointly control over 50% of the market for allergy testing and immunotherapy in 701 CBSAs, which includes markets where Plaintiffs compete with them. These co-conspirators control an even larger market share in areas where Plaintiffs have been driven from the markets. Quest's and the other co-conspirators' overwhelming market share for their related services within the market has stood for more than ten years and was only recently threatened by market entrants such as UAS starting in 2009.

40.     As the largest reference laboratory in the United States, Quest worked with Phadia and others to ensure that their co-conspirators would continue to enjoy their dominant position by refusing to work with UAS, misappropriating trade secrets from UAS, tortiously interfering with UAS's contracts and business relations with providers, and conspiring against them with their co-conspirators to enact reimbursement changes with payors that would effectively exclude them from the market.

41.     When Quest worked with Phadia and the other actors, they were headed towards a complete domination of the allergy testing markets—but they first had to exclude UAS from the market. Quest and Phadia, along with the other members of the conspiracy, agreed with each other to engage in the anticompetitive conduct discussed below to drive these competitors out of the market and erect additional market entry barriers, with the ultimate goal to further their attempt to monopolize and actual monopolization of certain markets for allergy testing and allergen immunotherapy. In exchange for Phadia's promotion of referrals of patients needing allergen immunotherapy to allergists, AANMA, ACAAI, and JCAAI agreed to recommend to

insurance companies and physicians that primary care physicians should rely on ImmunoCAPs performed by reference laboratories such as Quest as the exclusive form of allergy testing at the primary care level.  Quest and Phadia worked together in approaching physicians about not using UAS through anticompetitive means and instituted changes with payors to fully exclude them from reimbursement. The result is that primary care primary care physicians would be restricted to referring their patients for allergy blood tests on which Phadia and Quest maintain a monopoly, and would not be permitted to provide allergy skin testing or allergen immunotherapy, which would be reserved to specialists like board-certified allergists.

42.     The result of Quest and its co-conspirators' conduct has been the elimination of competition and the increase in market share by Quest, Phadia, and the other co-conspirators in the markets for allergy testing and allergen immunotherapy in the local geographic markets in the states of Arkansas, Arizona, Colorado, Florida, Georgia, Illinois, Iowa, Kansas, Kentucky, Louisiana, Missouri, Nebraska, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia and the erection of additional barriers to entry into markets in other states. Because such anticompetitive conduct aimed at private parties is not protected activity, but forbidden by the Sherman Act, the Texas Free Enterprise and Antitrust Act, the Texas Civil Practice and Remedies Code, and Texas common law, the Court should put an end to these unlawful and anticompetitive practices and restore and protect competition.

## QUEST'S CONSPIRACY AGAINST PRIMARY CARE & UAS

43.     Quest and Phadia, along with their other co-conspirators, noticed a considerable threat to their monopoly of allergy blood tests with the success of UAS and the primary care providers in contract with UAS. Quest and Phadia conspired with board-certified allergists,

insurance companies, antigen suppliers, AANMA, and others to agree not to do business with UAS or primary care physicians working with UAS, which ultimately reduced output and competition to the benefit of Quest and Phadia. When they agreed to exclude Plaintiffs from the market, they started to grow their sales and enhance their already-secured dominance of allergy blood testing.

44.     Phadia CSCs and Quest PAEs have long worked together to visit physicians and encourage them to use ImmunoCAPs. Fred Martin, Director of National Accounts for Phadia, would routinely send the Phadia roster of CSCs to Suzanne Hinton, the Quest West Region GETS Director, and Robert Jones, the Quest Senior Marketing Manager.  Phadia and Quest encourage their sales representatives to work hand in hand to sell ImmunoCAPs and to sign up new providers. Quest also encouraged their PAEs to collaborate with Phadia so that Phadia would be less likely to work with Quest's own competitors—other reference laboratories like CPL or Lab Corp. Phadia and Quest both recognized the value of their collaboration, as their success in selling ImmunoCAP would benefit both Quest and Phadia, and both Quest and Phadia enjoyed the dominant stance in the market for allergy blood testing.

45.     After UAS entered the market in 2009, Quest and Phadia representatives began discussing UAS, which at that time was referred to as "United Allergy," "United Allergy Labs," or "UAL."  Their concern was how UAS was significantly impacting Quest and Phadia's market share. Tom Wajda, the Phadia District Manager for Texas North (DFW Area) emailed Tonya Winders, the Market Development Team Leader, and Joe Fraas, the District Manager for South Texas, regarding reporting primary care physicians in contract with UAS who were offering skin prick testing to the Texas Medical Board. Wajda stated, "I recently had a conference call with some of the Quest people here in Dallas and we came up with the idea that since we can't find a

Medical Director that this maybe something we can report to the Medical Board. If we could find

a physician to do so, that would be ideal. Maybe an allergist would be angry enough if we told

them what United Allergy Labs, APCG and Smart Allergy Labs [other companies assisting

primary care physicians] are all doing."

46.     Quest and Phadia were already discussing the impact of UAS on their business

and recognized they could align their interests with board-certified allergists, who also felt UAS

was a competitive threat. At the same time, board-certified allergists, their businesses, and their

trade associations had coordinated their efforts to combat what they termed the "Remote Practice

of Allergy," which they defined as commercial companies marketing allergy testing services to

primary care physicians, and began communicating with payors about reimbursement policies of

primary care physicians in contract with UAS. Soon they would all work together to lodge a

unified conspiracy to exclude Plaintiffs from the market.

47.     For example, Joe Fraas, the District Manager for Phadia in South Texas, emailed

Edgar Saucedo and Sally Stilltner of Quest, regarding a Phadia district meeting. Fraas invited

them to present at the meeting with the presentation titled: "The Rules of the Road, 'Why Quest'

and Working Cooperatively in 2011. Hamlin, the Regional Vice President for Physician Sales of

Quest, emailed numerous Quest representatives days later asking for someone to participate in

the meeting "to allow for enhanced collaboration with their sales management team." Hamlin

recognized the importance of Quest and Phadia counterparts working together, especially since

the competitive threat of UAS was becoming more apparent.

48.     In 2011, Phadia continued to watch as the competitive threat of UAS affected its

sales. Phadia determined that because UAS was spreading rapidly, they would take action. Tonya

Winders ("Winders"), the market development team leader for Phadia, who would later leave

Phadia to eventually become the Chief Executive Officer of AANMA, was tasked with researching and developing a strategy for the Phadia executive team. Winders first drafted a "talking points letter" which included conversation points that sales representatives would have with physicians considering contracting with UAS. Winders drafted it on behalf of Phadia, and including false warnings about patient safety, medical and legal liability, and fraudulent billing wrongfully attributed to UAS.  After Phadia's legal counsel warned against using the letter with physicians, Phadia representatives ultimately shared this letter with their Quest counterparts to use as "talking points" when approaching providers and convincing them to not work with UAS.

49.     In July 2011, Phadia CSCs emailed each other regarding these tactics to get providers to use ImmunoCap, and not UAS. Tom Wajda, the Phadia District Sales Manager for Texas North (DFW area), emailed his team documents to help as they moved into the Fall allergy season.  These documents included the Remote Allergy Talking Points previously crafted by Winders. Wajda mentioned that the talking points were not approved by marketing and therefore restrained his CSCs from handing out hard copies. But included in another attachment were multiple references to Quest counterparts to secure accounts. Additionally, one attachment included strategies and a list of experts; Laurie Schroeder—a Phadia CSC—was listed as the Quest expert.  At this time, Schroeder was actively involved in the strategy to eliminate UAS and the providers in contract with UAS from the market, as UAS's impact was growing in the Dallas Fort Worth area. Schroeder emailed fellow CSCs in her district that Phadia would be covering its strategy and plan against UAS at an upcoming regional meeting. Phadia was aware of the competitive threat from UAS, and with its constant collaboration with Quest, they determined that they would work together to combat the threat and eliminate UAS from the market.

**Quest and Phadia Collaborate to Secure Monopoly of ImmunoCAPs and to Exclude UAS and Primary Care Providers from Allergy Services**

50.    After Winders was tasked at Phadia to research and craft a strategy to take on the problem of UAS and primary care providers offering skin prick testing and allergen immunotherapy in their offices, Phadia and Quest decided to have a meeting among their leaders. Phadia leadership emailed each other regarding a presentation for an upcoming meeting with Quest scheduled for Wednesday, July 27, 2011. Brian Yang, Phadia's Health Economics and Payer Policy Manager, emailed the slide presentation to leadership, and David Esposito, President and General Manager of Phadia, responded that the meeting and presentation needed to demonstrate the skills that Phadia has to encourage collaboration between the teams. Esposito wanted to discuss, among other things, the current payor pressures they were dealing with that were impacting their businesses and the extent of the competitive threat of UAS and to understand how the threat was affecting their sales.

51.    Included in the slide deck draft, for example, was a discussion on the ImmunoCAP Clinical Dossier, which included slides on the Phadia and Quest collaboration efforts, including attending meetings with Quest healthcare executives to impact reimbursement policies, and that Phadia would serve as the content experts on allergy blood tests when presenting to health plan medical policy teams. This plan was crafted in part to maximize their potential in meetings where Phadia representatives would explain the benefits of ImmunoCAPs and disparage UAS and skin prick testing as a substandard alternative.  Quest representatives would coordinate the meetings, as they had the direct relationship with payors since they billed payors for the ImmunoCAP test.

52.    With that in mind, Phadia and Quest leadership met on July 27, 2011, and following the meeting, Esposito emailed Thermo Fisher leadership—as they were finalizing the acquisition—regarding Phadia's sales shortfalls. Esposito noted that Phadia was experiencing a

significant shortfall on the allergy sales line, but that Quest was also experiencing a similar shortfall.  One of the reasons considered was competitive threats like UAS. Following this meeting in August 2011, Winders crafted a "remote practice of allergy strategy" for Phadia executive leadership, which would become the playbook for all of the actors in the conspiracy. Winders documented the conspirators' strategy after meeting with other industry leaders regarding the competitive threat of UAS. *See* **Attachment A**. After she sent this communication to Phadia leadership in late August 2011, Winders sent this communication to AANMA and other members of the conspiracy the next month in September 2011. She also sent an August RPA Update with additional information on her meetings with fellow members of the conspiracy, including Dr. Bob Overholt, Dr. Ty Prince, Ned DeLozier, Dr. Linda Cox, Dr. John Meiser, and others, and sent her initial strategy outline for "leading the charge to stop this market obstacle from negatively impacting your territories further." *See* **Attachment B**. Winders noted that the conspirators' plan would include communicating with board-certified allergists to reinforce their commitment to using Phadia products while addressing the remote practice of allergy in Texas, "identify and engage payor contacts throughout Texas who can help us initiate policy changes to limit 95004 reimbursement to board certified allergists," and to continue dialogues with the state and national board-certified allergist trade associations. When she documented her meeting with Dr. Cox, for example, she noted: "She is very interested in RPA strategy and agrees the payers are the key to stopping this behavior. We agreed to strive to limit 95004 reimbursement to board certified allergists. She was very appreciative of our efforts and supportive of the outlined strategy in TX." Winders similarly shared this communication with AANMA and other members of the conspiracy.

**Quest and Phadia Boycott UAS**

53.     Following the summary of her meetings with other members of the conspiracy, Winders sent the comprehensive "remote practice of allergy strategy" to Phadia leadership, AANMA, board-certified allergists and their trade associations, including JCAAI President James Sublett, MD. *See* **Attachment C**. Winders emphasized, "I am now more convinced than ever that this trend is dramatically influencing our team's ability to achieve its growth targets." Included in the conspirators' strategy was to secure support from AANMA and the national allergy trade associations to support ImmunoCAPs as the preferred tool for primary care testing, contacting the Texas Medical Board, "leverage Quest & CPL relationships to identify & engage contacts at the following payers to secure policy change to reflect CPT 95000 series can only be reimbursed to board certified allergists or certified AAOA members," and among other listed undertakings, to report fraud and abuse to payors. The payors listed in the strategy plans were Texas Medicaid, Humana, Blue Cross Blue Shield, United Healthcare, Aetna and Cigna. As part of this "remote practice of allergy strategy" that the co-conspirators crafted to take down UAS, Phadia and Quest worked together to achieve the goals through their sales staff strategizing about individual providers and their leadership discussing how to enhance sales and minimize the threat. In response to Winders' strategy documents, Martin, the Phadia National Accounts Director who controlled the relationship with Quest, responded that he would meet with Brian Yang about how to effectively work with Quest and their payor team to change reimbursement policies. Winders responded thanking Martin and emphasizing that enacting reimbursement policy changes was the only way to fully combat the threat of UAS. All of Phadia leadership was copied on this email. Winders also sent this comprehensive strategy to other members of the

conspiracy, including AANMA and board-certified allergists, securing support and agreement for the exclusion of UAS from the market.

54.     As leadership had planned from their meeting with Quest leadership earlier that summer, Phadia would use Quest's relationships with payors and its contacts at health plans to enact reimbursement policy changes—to exclude UAS and the providers in contract with UAS from getting reimbursed for their services.   And as will be demonstrated, Phadia and Quest undertook many of these goals together, including meeting with Texas Medicaid and Blue Cross and Blue Shield, and secured support statements promoting ImmunoCAPs as the preferred testing method for primary care providers. Phadia and Quest's co-conspirators, including board-certified allergists and their trade associations, met and communicated with Humana and United Healthcare. Together, the co-conspirators discouraged payors from reimbursing providers in contract with UAS by accusing those providers of fraud and abuse, and by creating a false "standard of care" that primary care physicians should only use ImmunoCAPs, or allergy blood tests, and not skin prick testing.

55.     Around the same time the strategy was being developed, UAS reached out to Quest to inquire about either purchasing an Immunocap instrument to expand allergy testing capabilities for patients with food allergies or who otherwise could not be tested using skin testing, or alternatively using Quest as a place to refer patients for these services. The request was first made to a Quest PAE, who forwarded the request to Becki Scribner of Phadia.   The request became a subject of email communication among Phadia leadership, including Fred Martin, Phadia National Sales Director who handled the Quest account, Anthony Notarthomas, Director of National Accounts and Marketplace Strategy, Tonya Winders, the Market Development Team Leader, and Joe Fraas, District Manager for Houston.

56.     In an email with Phadia leadership, Winders emphasized to the other Phadia officers that she was concerned because Phadia decided not to work with UAS and did not want anyone else to work with UAS either. Winders noted that UAS was gaining market share in allergy testing and immunotherapy and requested from Phadia leadership to contact Quest and direct Quest to deny business relationships with UAS to prevent UAS's expansion. Martin agreed, recommending that Winders first handle the issue through local Quest management in San Antonio, but to take it to higher levels if necessary. Martin requested that Winders keep him updated on the communications and noted in a later email that he would elevate the situation if necessary, but hoped that the local level would take care of the potential problem of Quest working with UAS.

57.     Therefore, the next day, Winders emailed Rey Valadez, a CMR – Quest Genomic/Esoteric Testing Specialist located in San Antonio, regarding the potential for working with UAS. She wrote to Valadez that they agreed, on behalf of Phadia and Quest, to deny a request from UAS to purchase an ImmunoCAP instrument or otherwise work with UAS and did so based on the competitive threat UAS posed not only to Quest and Phadia, but to their competitor co-conspirators including board-certified allergists. Winders thanked Valdez for his assistance in collecting intelligence on UAS, and warned Valadez that there would be consequences if Quest ever decided to supply or work with UAS.

58.     Valadez responded thanking Winders for her update and asked whether Winders' communication could be forwarded to the UAS person he had met with the previous day. Winders responded to forward her the UAS representative's contact information and that she would respond. Paul Gross, the Quest District Sales Manager for the San Antonio region, where UAS is based, responded to the email chain stating that he would work with his representatives

to spread the word on Quest and Phadia's agreement to combat and elimniate UAS as a market threat. Winders thanked Gross for his support and leadership, and then forwarded the email chain to Phadia leadership, who lauded her communications and agreement with Quest. With Quest and Phadia agreeing to not work with UAS because of a competitive business model, they were on their way to working on a national campaign to discourage physicians from working with UAS to institute nationwide business effects.

## QUEST KNOWINGLY MISAPPROPRIATES UAS'S TRADE SECRETS

59.     Meanwhile, unaware of the agreement between Quest and Phadia to eliminate UAS from the market, UAS continued to follow up on the confidential negotiations it had previously initiated with Quest.  In November 2011, Michael Kattany, a Resource Inventory Manager for UAS, emailed Quest's Valadez. Kattany asked Valadez for contact information for Phadia's Medical Director and the Quest counterpart so that UAS representatives could speak to them. Valadez, who had already agreed not to work with UAS on behalf of Quest (through his communications with Winders), forwarded the email to Winders and copied other Phadia and Quest representatives, as well as Michael Kattany. This email was shared with Phadia leadership and eventually Winders responded internally at Phadia that she and the Houston district manager for Phadia met with their Quest counterparts already regarding this issue and agreed not to do business with UAS.

60.     The next month, in December 2011, Kattany followed up with Valadez asking if he had received any answers or contact information from his previous email request. Almost two weeks later, in January 2012, Kattany again emailed Valadez stating that UAS wanted to set up a referral program for all of its accounts so that the providers could send their patients to a Quest testing facility for allergy blood testing. As part of what UAS considered to be confidential

negotiations with Quest, Kattany attached a document containing UAS's customer list titled "UAL Account List by Zip Code." Quest's Valadez did not adhere to the confidential nature of the discussion, but instead emailed the UAS list Phadia through Becki Scribner, a Phadia CSC in San Antonio, Ranita Adams, another Phadia CSC in San Antonio, and Joe Fraas, Phadia district manager for the Houston district. Despite knowing that UAS intended the list to be kept confidential, Quest never told UAS that it shared its confidential and proprietary trade secret customer list with Phadia.

61.     Upon receipt of UAS's customer list, Phadia emailed the proprietary and confidential list provided by Quest to their sales staff to use in their efforts to target UAS's customers with misleading information about UAS. In February 2012, Tom Wajda, the district manager for the Dallas Fort Worth district, emailed his CSCs the confidential account list telling them that it was the UAS account list by zip code and that they would be good targets for them to approach in their office visits. He recommended his sales staff to use the list with their new strategy to exclude UAS from the market.

62.     On September 29, 2017, the Western District of Texas issued an opinion following the parties' summary judgment motions in the federal antitrust actFtion, *Academy of Allergy & Primary Care, et al. v. Allergy and Asthma Network/Mothers of Asthmatics, Inc.*, et al., Civil No. 5:14-CV-35-OLG. The Court considered the sharing of the proprietary and confidential customer list by Quest and Phadia's use of the list, noting that Phadia district manager Wajda stated that such accounts "will be good targets for us to approach with your new strategy of Immunotherapy." The Court reasoned that "a reasonable juror could find that Phadia's interference was the proximate cause of the injuries described" in UAS and AAAPC's expert regression analysis, and that:

Plaintiffs' evidence of causation goes beyond speculation or guess. Rather, it permits a finding that Plaintiffs' damages were the natural and probable result of the efforts undertaken by Phadia and its alleged co-conspirators to persuade physicians to limit or terminate business relationships with UAS. Indeed, such a finding would be consistent with the beliefs of the Phadia personnel who carried out that effort, who, in Plaintiffs' evidence, make clear that they believed the purpose and effect of their outreach to PCPs was to place UAS at a competitive disadvantage.

63.     Quest provided Phadia with this information after agreeing with Phadia that both parties would not do business with UAS. Then, when Phadia used the information to approach physicians with their new strategy in combatting UAS, they did so with the explicitly stated intent of putting UAS "out of business" to minimize the threat to their market of allergy blood testing.

64.     Around this same time that Quest and Phadia agreed with each other not to work with UAS and to not sell ImmunoCAPs to UAS, and shared UAS's proprietary and confidential account list without UAS's permission or knowledge, Quest and Phadia sales representatives, PAEs and CSCs, respectively, started working together in their visits to providers and in discouraging physicians from working with UAS by using false and coercive claims of fraud, substandard care, and legal liability. With the account list in hand, Phadia and Quest began to meet with each other to collaborate on strategies and provider contacts to discourage them from contracting with UAS. Quest and Phadia determined that they should work together to spread the message to providers that primary care physicians' reliance on the services of UAS was inappropriate, that primary care physicians were engaged in billing fraud and "pass through billing," that the practice of "home immunotherapy" was "investigational" and should not be reimbursed.

**Quest and Phadia Use an OIG Opinion to Coerce Physicians and Malign UAS**

65.     One of the methods that Quest and Phadia would use to discourage UAS customer relationships was to falsely suggest that UAS was in violation of an OIG Advisory Opinion, thereby coercing physicians to deny relationships with UAS for fear of federal criminal or civil prosecution.  Phadia CSCs and Quest PAEs started to use an opinion of the Office of Inspector General of the United States Department of Health and Human Services ("OIG") Opinion No. 11-17 ("OIG Opinion") to discourage physicians from working with UAS. The OIG Opinion was not requested by UAS, but by a fraudulent company called "Universal Allergy Labs" that was formed to appear like UAS's prior d/b/a name, "United Allergy Labs"—as both companies would have the same acronym, UAL. The shell company was formed by Patrick Strauss and James Wallen, and Wallen would later become a consultant for AANMA, one of Quest and Phadia's co-conspirators.   The OIG issued the opinion in November 2011 after the fake UAL provided information to the OIG in requesting an opinion that the company would be operated by an individual with no healthcare experience, that its motive was to "exploit a business opportunity," and that the inexperienced head of "UAL" would have the final say whether personnel "UAL" hired were adequately trained to perform healthcare-related services. In response to these statements, the OIG published its opinion and expressed serious concerns about the business model of the inexperienced, shell entity. Following the publication of the OIG Opinion in November 2011, the co-conspirators, including Quest and Phadia, spread the OIG Opinion in a manner to harm UAS, by wrongfully attributing the opinion to UAS and discouraging providers from working with UAS for fear of participating in alleged illegal activity, reimbursement issues with insurance companies, violations of the state medical board, or threatened litigation from UAS. Phadia and its co-conspirators were successful in scaring

providers from working with UAS, and from providing this false information to payors that the opinion concerned UAS.

66.     Ultimately, Phadia trained its entire ImmunoCAP sales force to tell providers and others in the marketplace that the OIG opinion applied to UAS and therefore they should not do business with UAS because it risked fraud and legal liability.  Phadia held a nationwide training for all CSCs to understand the opinion and how to utilize it with new providers and existing accounts. After Phadia used the OIG opinion and started communicating with Quest regarding the opinion, Quest PAEs would use the opinion with their Phadia counterparts and Phadia instituted training sessions for Quest PAEs as well.

67.     In February 2012, Quest held a meeting titled Q1 Plan of Action for Allergy/Asthma. The agenda included a market overview, clinical aspects, strategy, tactics, and tools. The presentation noted, "We have to use all of our resources especially our Thermo Fisher partners, to win back our business from hospitals and smaller labs." Though Quest was actively working on enhancing sales with Phadia, it recognized that it must do more with Phadia.

68.     Later that month, for example, Bob Tergerson, Quest Director of Patient Services, told the Quest Project Director for Patient Experiences, Cathy Garroni, that he noticed "a lot of attention to Immunocap received," as he received emails and calls the previous week during the national sales meeting held in Dallas. Garroni responded that she heard from Lisa King in marketing that "ImmunoCAP is one of the Q2 (April) campaigns that will be promoted in the PSCs." Across the board, Quest and Phadia each recognized the value in collaborating to eliminate the competitive threat from UAS.

69.     In September 2012, Jorge Hernandez, South Florida Sales Director for Quest, emailed the district sales managers and directors for Quest following a call that day, and

instructed everyone "Please assign yourselves the task of meeting with your Thermo-Fisher counterparts in the next two weeks to begin the planning phase for your Q4 ImmunoCap programs." Attached to Jorge's email was the Quest 11-4-11 Review Presentation that featured a map of Phadia district managers and stated "Coordination between Quest Region Directors and IDD Region Directors will enable optimal reach and frequency in the local geographies." Following this email, Lisa King, a Quest marketing representative, emailed sales directors and stated that they had completed their webinars and needed to start selecting speakers for their speaker program for the Fall. She again reiterated to the sales directors that their district managers needed to reach out to their Thermo Fisher counterparts to "determine the best growth opportunities for their districts." Attached to King's email were various documents on the speaker program and Phadia's list of educational speakers, including such board-certified allergists and ACAAI and JCAAI officer as Dr. Lyndon Mansfield, Dr. Linda Cox, who had previously agreed to joint Phadia and Quest's remote practice of allergy strategy. Phadia and Quest continued their collaborative efforts to keep PAEs and CSCs working together when calling on physicians, and they utilized certain speakers that were involved in the conspiracy.

70.     In March 2013, Fraas, the Phadia district manager for the Houston area, emailed his manager, Wayne Ganong, the previous email where Quest and Phadia agreed not to work with UAS. Though it was almost two years later than the original email, Phadia representatives were still discussing the decision with Quest to not work with UAS.

71.     The next month, in April of 2013, Phadia and Quest held a "Joint Marketing Meeting." The agenda included 2012/2013 performance, 2012 accomplishments, 2013 national sales meeting, 2013 strategy and tactics, and a working session on "Building a Successful Collaboration." The presentation included performance data, tools, and ways to differentiate

Quest and ImmunoCap, as well as roles and responsibilities of Quest and Phadia representatives. The "ImmunoCap Champions" would conduct bi-weekly calls to share best practices and identify issues, would drive client events best practices, and track and measure performance, the Phadia representative would support Quest's selling efforts for agreed-upon target accounts, would collaborate with Quest PAEs to identify target accounts and prioritize sales calls, and act as the "Subject Matter Experts to support the sale." The Quest PAE, on the other hand, would own the account, retain and grow existing Quest accounts and grow new business, "[e]xecute Quest Diagnostics Tactic," bring in Phadia representatives to "serve as SME's and support selling process," and follow up and close.

72.     In May 2013, leaders of Quest and Phadia met to discuss the status of their collaboration strategy. Matthew Hamlin of Quest emailed Wayne Ganong, Fred Martin, Jeff Snyder, and Brandon Massey of Phadia thanking them for the meeting. He stated that he hoped they agreed that they could walk away from the meeting with plans to enhance ImmunoCAP sales, and would continue to monitor their success by keeping in touch with leaders of Quest. Ganong forwarded the message to Esposito and Martin, and said that having Paul Gross involved in the collaborative effort was an important change in their success.

73.     Later that month, on May 29, 2013, Dennis Flannelly, Head of US Marketing for Phadia, and the marketplace strategy and marketing teams from Phadia met with Quest marketing leadership. Flannelly thanked everyone for meeting and emphasized the need for collaboration, since both company's sales on ImmunoCAPs were not where either company wanted them to be. Flannelly then detailed specific strategy items to boost sales, and included in those items was an emphasis on combatting the competitive threat of UAS. He stated that Phadia would provide training for Quest and provide comprehensive information on the impact of UAS

and providers in contract with UAS on ImmunoCAP sales. Steve Grabosky, Senior Diagnostics Specialist and National Accounts Executive, would hold the training for Quest.

74.     At this time, Phadia was already training its district managers to instruct and train their sales representatives to use the OIG Opinion to discourage providers from working with UAS, and continued to work with other co-conspirators on approaching payors to change their policies to stop reimbursement for primary care physicians practicing skin prick testing and immunotherapy. When Grabosky was tasked with training Quest sales representatives on the competitive impact of UAS, Phadia had already trained its sales staff to use certain anticompetitive tools to exclude UAS—and that information would be passed on to Quest to similarly combat the competitive threat.

75.     After this training was in full force and the Quest sales staff was ready to use the OIG opinion and other tools to discourage providers from working with UAS, Phadia district managers continued to work with their counterparts to target individual offices with their strategy. In June 2013, for example, Jeff Snyder, the Phadia district manager for Austin, emailed Quest sales staff Edgar Saucedo, Brian McKee, Paul Maloney, and Christa Collins with Paul Gross and Wayne Ganong of Phadia copied, regarding the Quest/Phadia strategy and initiative. Snyder said that he and Gross had been talking about the initiative, which would drive "ImmunoCAP profile growth" that will, "in turn, drive revenue as well." He said that he hopes to implement this initiative at a district level, and that both Phadia and Quest want it at a regional and national level as well. He emphasized that in making it work, they needed transparency and open communication, collaboration, understanding, and a sharing of resources. He has seen a "substantial increase in activity between our teams." Saucedo responded to Snyder and said that he was "in synch with your messaging and focus" and invited him to his weekly conference

calls. This initiative directly targeted UAS to discourage physicians, practice groups, and large hospital systems from working with UAS.

76.    While Phadia and Quest trained their sales staff to work together when visiting physicians' offices to discourage them from working with UAS, they also worked together to in approaching payors about changing their reimbursement policies to deny reimbursement for primary care providers offering skin prick testing and immunotherapy. They hoped to implement policies that instead encouraged, and sometimes required, primary care physicians to utilize allergy blood tests and to refer patients to specialists for immunotherapy by excluding primary care physicians from skin prick testing and immunotherapy.

77.    Brian Yang, the Health Economics and Payer Policy Manager for Phadia, worked with his counterparts at Quest, including Kelly Gaulke, the Health Plan Executive Account Manager and John McLaughlin, the Executive Director for Health Plans and Government Affairs. Yang disclosed during his deposition in the federal antitrust case that he received names from Gaulke and McLaughlin and coordinated meetings through them to visit with payors. Since Quest was the company that would actually bill for the ImmunoCAP test, Quest had a direct relationship with each payor. Phadia and Quest worked together to set up the meetings and to convince payors to stop reimbursement of primary care providers offering skin prick testing and immunotherapy.

78.    Also in February 2012, Phadia District Manager for the Southeast, Craig Page, emailed Martin and Dan Gregory, a Phadia CSC in Georgia, regarding the Quest POA meeting the next week. Page asked Martin about meeting in the hotel lobby at the meeting to discuss the opportunity and to ask about opportunities to speak to an executive at Blue Cross Blue Shield of Tennessee. Page then emailed Wajda for pointers from his regional meeting with Quest, and

Wajda responded that his meeting went well, and that Quest representatives asked about Phadia's strategy of combatting the threat of UAS and other reference laboratories. Wajda told Page that he encouraged collaboration with Quest, as the more they collaborate the better situated they would be to overcome the competitive threat of UAS. Phadia CSCs and Quest PAEs would continue these communications to enhance their collaboration in fighting UAS and primary care providers choosing UAS over ImmunoCAPs.

<u>**Quest and Phadia Approach Payors**</u>

79.     Around the same time, Quest and Phadia began working together to approach payors about changing reimbursement policies to be less restrictive on the maximum number of allergens in allergy blood tests, and to be more restrictive on who could perform allergy skin prick tests and immunotherapy. These changes would ultimately help Phadia, Quest, and their co-conspirators, and hurt UAS and the physicians in contract with UAS—as primary care physicians could continue to refer patients to Quest for allergy blood tests, but such policies would restrict skin prick testing and immunotherapy to specialists, like board-certified allergists.

80.     In August 2012, for example, Quest and Phadia communicated with Arkansas Blue Cross and Blue Shield to enact policy changes that would exclude UAS and the providers in contract with UAS from the market. Paula Cunningham, Medical Policy Specialist at Arkansas Blue Cross Blue Shield emailed Kelly Gaulke, Health Plan Account Executive at Quest, regarding an upcoming meeting in September with Arkansas Blue Cross and Blue Shield medical directors. Cunningham asked Gaulke for attendees and for the reason for the meeting. Gaulke sent the email to Burnett, a Phadia CSC in Arkansas and Kevin TenBrink, National Account Executive at Phadia, to see if the dates worked for a meeting. TenBrink responded stating that the date did not work for Phadia's chief medical director and requested Burnett to

collect information in preparation for the meeting, and gave Gaulke a draft email for the allegedly valid purpose for the meeting, stating that Phadia wanted to communicate with Arkansas Blue Cross Blue Shield to provide allergy testing opportunities for its members.

81.     In June 2013, Phadia met with Texas Medicaid regarding policies on allergy testing and immunotherapy. Quest's McLaughlin provided Yang with the contact and email address of who to meet with, and they worked together to craft a strategy for their meeting. Phadia presented to Texas Medicaid falsely claiming that allergy skin testing and immunotherapy was being fraudulently used by primary care physicians working with UAS. Phadia recommended that Texas Medicaid fix prices that would benefit Quest and Phadia to the detriment of these competitors, by limiting skin prick testing to only 10 units and to set the reimbursement for allergy blood tests to 25 units. Phadia's and Quest's goal was to eliminate allergy skin testing from the market by setting prices that would be below marginal costs for those tests and was not related to any justifiable basis.

82.     Following Phadia's initial meeting with Texas Medicaid and their chief medical director, Dr. William Brendle Glomb, Ben Davol, Head of Public Policy for Phadia, emailed Phadia leadership that Phadia received approval of an increase to 30 allergens after another meeting with Phadia's lobbyist and Texas Medicaid. During this second meeting where Texas Medicaid indicated that it would respond to Phadia's request for a policy change, UAS was discussed at length as a reason for the change. Davol also disclosed that the change should take effect that coming fall, and Tony Notarthomas, Phadia's Director of National Accounts and Marketplace Strategy responded praising the success and emphasizing that Phadia need to further capitalize on this strategy with Quest. Notarthomas emphasized that Phadia and Quest now have the message to continue with their progress in excluding UAS.

83.     The next week, after Phadia and Quest received news that their intended strategy of a policy change for Texas Medicaid succeeded, Paul Gross sent a message to various Quest representatives regarding meetings with Phadia representatives. Gross asked that each person invite their Phadia counterpart to their next district sales meeting, as they would be providing information on the peanut/egg/milk component testing in the upcoming days, and additionally they had "run across competitors such as United Allergy Labs that promote scratch testing and immunotherapy. There are innate issues with this model and TF [Thermo Fisher] has developed a program that may provide an answer to this competitor. Again TF [Thermo Fisher] can explain this in more detail but in the meantime I am looking to invite Laurie Schroeder, Medical Group Consultant at Thermo Fisher Scientific to our next leadership call to discuss the two important areas."

84.     At this time, Laurie Schroeder, a former CSC for Phadia and now promoted Medical Group Consultant, was working in the Dallas Fort Worth area with providers and hospital systems to discourage them from working with UAS. Schroeder utilized the OIG Opinion, publications from Phadia and Quest's co-conspirator, AANMA, and other tools to convince providers not to work with UAS based on unfounded claims of patient safety and fraud. Quest requested Schroeder to speak to its sales staff to share Phadia's strategy of discouraging providers from working with UAS and to instead utilize ImmunoCAPs.

85.     The next month, in July 2013, Quest's Gross forwarded various Quest representatives ImmunoCAP sales updates that showed negative sales, and said, "I wanted to forward this message onto you all and remind you we have a lot of support from our Thermo-Fisher vender partner. With that support comes expectations. Please use your many assets to help drive your business at a higher level." A few weeks later, Gross emailed his team once again

alerting them to a "dramatic drop in our numbers," and encouraged them to look for opportunities to do luncheons with Phadia as well as regular hallway visits with providers.

86.     Deborah Green, Director of Commercial Marketing at Quest, emailed the sales directors regarding the Fall ImmunoCAP Allergy and Back to School Program two-phase implementation plan, including phase 1 of online tutorials and phase 2 of refresher and question and answer sessions. Green stated that 253 sales representatives called in for the live refresher and Q&A sessions. The panel for the Q&A included "ImmunoCAP champions" from Quest, the medical director Dr. Stan Naides, and two expert-guest panelists from Phadia, Larry Zemlick and Dr. Rob Reinhardt. These informational sessions included Quest's and Phadia's joint strategies.

87.     Following Quest and Phadia's success with Texas Medicaid, they worked again to implement policy changes at Arkansas Blue Cross and Blue Shield to exclude UAS and the primary care physicians in contract with UAS from being reimbursed for skin prick testing and immunotherapy. Yang disclosed during his deposition that Gaulke of Quest set up the meeting for Phadia, though she did not attend. The Arkansas Blue Cross Blue Shield policy had a number of restrictions for allergy blood tests, and Phadia stated that it was hoping to increase prices for those tests. However, Phadia and Quest also intended to limit and potentially stop reimbursement for primary care offering competing skin prick testing and also damage those competitors and UAS with restrictions on immunotherapy reimbursement.  In furtherance of this strategy, Phadia and Quest agreed they would provide Arkansas Blue Cross and Blue Shield with misleading and derogatory information about UAS.

88.     Therefore, in July 2013, Phadia CSC Doug Burnett communicated with the "Arkansas Quest team" regarding the upcoming Phadia meeting with Blue Cross Blue Shield of Arkansas. He wrote to the Quest team that his team was preparing to meet with Arkansas Blue

Cross and Blue Shield to implement positive changes, and that he and Gaulke had given them a lot of information to prepare for their meeting. He emphasized that they were prepared to inform Arkansas Blue Cross and Blue Shield about UAS to lead them into believing they were being abused by companies such as UAS.

89.     The information that Phadia and Quest prepared for the meeting with Arkansas Blue Cross and Blue Shield included confidential Explanation of Benefits forms from patients of primary care physicians in contract with UAS, information on UAS billing, and other proprietary and confidential information. Phadia and Quest also worked together to prepare information for payors that if payors continued to reimburse primary care physicians in contract with UAS, they too might face criminal or civil liability. Though UAS provides a less expensive option for allergy testing and immunotherapy—and payors therefore would normally be incentivized to reimburse for less expensive medical claims and act in their own self-interest—the co-conspirators falsely and wrongfully convinced such payors that they would be reimbursing fraudulent claims, and therefore deceived and coerced them into changing their policies to satisfy the conspirators' end goal of excluding UAS and primary care physicians from the market.

90.     During the meeting that Phadia attended with the chief medical director of Arkansas Blue Cross and Blue Shield, Dr. John Brineman, Phadia recommended policy changes of removing the 10 allergen screening requirement of blood tests to instead pass a 30-unit limit for all testing. Similar to the Texas Medicaid change, Phadia intended to limit skin prick testing to below marginal cost where physicians would not be economically motivated to offer this service to their patients. They also discussed UAS at length, and Phadia followed the meeting by sending information on UAS to Arkansas Blue Cross and Blue Shield to put together a strategy

for perceived utilization issues of primary care physicians in contract with UAS.  Officers of both Phadia and Quest were aware that such contacts with payors were inappropriate.

91.     Following the meeting and email from Burnett, Chad Lockwood, Quest Sales Director for Arkansas, followed up and asked if Burnett had heard anything in response to the meeting. Burnett responded that the meeting went well and that the Phadia team hoped within a few months that changes to policies would be happening and that Gaulke was in communications with her contact at Arkansas Blue Cross and Blue Shield to find out any updates.

92.     In August 2013, Burnett emailed Gaulke, Health Plan Account Executive at Quest, regarding Blue Cross Blue Shield of Arkansas. Burnett emailed Gaulke asking, "Did you ever hear anything from Paula at BCBS? One thing that was brought up during the meeting was the United Allergy Services that have taken Arkansas by storm. In fact, Quest and I lost another account to them in the last 2 weeks. BCBS indicated to my people that they were on this scheme but didn't give us any specifics as to their plan. BCBS of Texas has dropped the hammer on them as have some other states." Gaulke responded, "I didn't ask about it but will send a note. Do you have details on what BCBS of TX did?" Burnett then emailed Gaulke the BCBS TX letter and Gaulke responded, "Hmmm…very interesting!" Burnett responded, "I wish Paula had that letter to show [Arkansas Blue Cross Medical Director] Brinemann."

93.     In accordance with the agreement to work with Phadia and Quest, Winders, now the Chief Executive Officer of AANMA, also communicated directly with payors.  In September 2013, Winders writing on behalf of AANMA sent a letter to over 100 payors about the remote practice of allergy—in furtherance of the conspiracy. The false and misleading letter stated that AANMA wrote to express their concern over a deceptive practice driving inappropriate and excessive utilization of allergy testing and immunotherapy in primary care. AANMA cautioned

payors about the supposed fraudulent business practices of third party organizations contracting with primary care providers, and included a link to the same OIG Opinion that AANMA's co-conspirators, Quest and Phadia had been circulating to physicians and payors.   AANMA's letter also included a link to the AAAPC website with the list of member physicians, encouraging payors to audit and investigate them for excessive billing. Many insurance companies who received the letter ran audits and investigated primary care physicians, causing damage even when they did not change their reimbursement policies. Many of the physicians exited the market for allergy testing and immunotherapy as a result and ceased to be AAAPC members.

94.     Meanwhile, Quest continued to work with Phadia following the meetings with payors and training sessions on how to combat the competitive threat of UAS. In January 2014, Keith Ward, Quest Regional Director of Field Services, emailed various directors at Quest regarding a meeting with Fred Martin, National Accounts Manager for Phadia. Ward stated, "[a]s a region we struggled with ImmunoCAP last year and have great opportunity for improvement. This meeting will serve as a great way to kick off the new year."

95.     After management at both Phadia and Quest gave their sales staff marching orders to eliminate the threat of UAS on ImmunoCAP sales, Phadia CSCs and Quest PAEs continued to work together, with the other members of the conspiracy, to convince providers not to work with UAS. The materials included the OIG Opinion and false statements and articles by AANMA attacking UAS.  The goal of the Quest and Phadia salesforce was to convince providers through the use of the OIG Opinion and false threats that providers would face criminal liability, litigation from UAS, and investigations from payors.

96.     Meanwhile, AANMA hired James Wallen in 2014, who was instrumental in requesting the OIG opinion that was then used by the co-conspirators to convince payors and

providers not to work with UAS—by falsely attributing the opinion to UAS. As part of his duties for AANMA, he met with Patrick Strauss, the other founder of the fake "UAL" to gather more information on UAS to use against UAS in the market. Wallen was also tasked with drafting communications to payors, malpractice providers, and healthcare professionals regarding the alleged fraud and abuse of primary care physicians practicing allergy skin testing and immunotherapy.

97.     In May 2014, as Phadia and Quest continued their collaborative effort to discourage providers from working with UAS, Phadia Dallas district manager Brandon Massey emailed Quest directors regarding the Phadia and Quest collaboration. Massey stated that he had recently met with Timothy McDaniel to get the teams collaborating on several key targets. Massey attached a "listing of our top shared ImmunoCap Growth Accounts" and asked to "let him know how we can better support you and your team in any area you see opportunity." He attached a list of provider targets, and one, Texas Health Resources HEB's activity was "Targeting Medical Director James Terry" and the outcome was "TBD – Currently UAS but being directed away from usage." Quest and Phadia continued to work together to stop primary care physicians from working with UAS, including, for example, UAS's largest customer, Texas Health Resources, one of the largest nonprofit health systems in the United States and the largest in North Texas.

98.     Around the same time, Phadia met with Parkland Community Health Plan numerous times in 2014 and provided their medical director, Barry Lachman, with false and defamatory information regarding UAS and sent them at least one publication from AANMA titled "Deception in Allergy Care." Phadia also sent the "Deception and Fraud in Allergy Care" publication to providers, along with the OIG opinion, to caution them about the threat of criminal

liability, investigations from payors, and litigation with UAS. Quest PAEs continued to meet with their Phadia counterparts to plan and coordinate these meetings.

99.     Quest and Phadia also used the recent policy changes by payors, including a managed care organization in Texas, Superior HealthPlan, Inc. in June 2014, to boost their collaborative efforts between Quest PAEs and Phadia CSCs. Following the meeting that Phadia had with Dr. Glomb of Texas Medicaid, Dr. Glomb moved to Superior Health Plan as their Senior Medical Director. Superior then issued a provider alert requiring pre-authorization for any primary care physician practicing allergy skin prick testing and immunotherapy, but without a pre-authorization requirement for allergy blood tests.

100.    In September 2014, after the Superior provider alert was announced, Ray Samaniego of Quest emailed others at Quest regarding the Superior policy change. Samaniego wrote, "I spoke to Yvonne Houghton today with Thermo Fisher. She informed me that Superior Medicaid plan is no longer paying for skin prick testing. I will be notifying my clients. This could be a good upsell for [sic] each of us." Edgar Saucedo, the Quest Sales Director for the Southwest Region, stated, "Sounds like an opportunity. Let's Go Get It!!!

101.    A couple of weeks later, on September 21, Keith Ward, Executive Sales Director for the Southwest Region, emailed Quest representatives and stated "I know that you are all well aware of the recent changes with Texas Medicaid and ImmunoCap (now is available without restrictions). I don't know if you have seen the attached collateral. If you have not already engaged your Thermo Fisher counterpart regarding how you can better collaborate on this initiative and to generally take advantage of the current season we are in, please do so without delay!" Ward attached a "Provider Alert" stating that ImmunoCAP is now available without restrictions for your TX-Medicaid patients as a covered benefit. Both Phadia and Quest

celebrated their recent success in payor policy change and intended to use it to discourage providers from working with UAS and instead utilize allergy blood tests.

102.    Following this email, Edgar Saucedo forwarded to his team Ward's email and emphasized, "This is a good opportunity for us to leverage the 'Allergy Season' and this new change to Medicaid coverage. Please reach out to your Thermo Fisher counterpart. Most of you are already working with them so why not enhance the partnership with this new coverage. Good Selling!!!"

103.    Phadia and Quest continued to approach individual providers and payors in 2014 and 2015 regarding the negative impact UAS was having on their ImmunoCAP sales. Quest and Phadia continued to work with other co-conspirators to minimize the competitive threat. They continued to use the customer list that Quest misappropriated from UAS to find possible leads to discourage providers from working with UAS and to sign them up for ImmunoCAPs instead. Even in April 2015, Quest and Phadia continued to use the OIG opinion to discourage providers from working with UAS and provided information on how to locate additional false and deceptive information on UAS, including lawsuits, the JCAAI newsletter regarding the OIG opinion, and other background information. As Phadia CSCs were instructed not to give hard copy material to avoid a paper trail, they were encouraged instead to verbally communicate ways of discovering the information, such as google terms—since such materials were not approved by Phadia to hand to providers. Phadia also continued to warn providers that they would be shut down or investigated by governmental and policing authorities, such as North Carolina Medicare, Medicaid, and state health plans.

104.    Additionally, as recently as January 2016, Phadia and Quest continued to have communications with payors about changing reimbursement policies that had no medical basis,

but instead only furthered Phadia and Quest's interest. For example, Phadia's Yang continued to seek a cap on payments for allergy skin testing by competitors.

## Quest Hid its Activities and Role in the Conspiracy

105.    Quest and its co-conspirators fraudulently concealed their coordinated activity, including Quest's role as an additional actor in the conspiracy.  Quest and its co-conspirators' conduct demonstrates a deliberate effort to cover their tracks by using "talking points" and oral communications with physicians and payors in an effort to avoid a discoverable paper trail. Plaintiffs also had to consistently request and demand information from the parties in the federal antitrust case and against Quest itself through a third-party subpoena. Plaintiffs subpoenaed Quest in the federal antitrust action on December 29, 2015, and Quest responded on January 13, 2016, lodging objections but stating that it would produce documents after a reasonable search after Plaintiffs and Quest negotiated a narrowed search for responsive documents. *See* **Attachment D** and **Attachment E**. On March 25, 2016, however, Quest changed its course, writing to Plaintiffs that it refused to provide a witness on any of Plaintiffs' topics on Plaintiffs' Notice of Deposition pursuant to Rule 30(b)(6). *See* **Attachment F**. Quest also produced under 500 pages of documents in response to Plaintiffs' subpoena—and deliberately withheld any information demonstrating Quest's participation in the conspiracy. *See* **Attachment G**. As Plaintiffs had to discover this information only from third-party subpoenas and discovery from this case, there is likely much more to the narrative of Quest's bad acts.

## HARM TO COMPETITION FROM QUEST'S AND CO-CONSPIRATORS' WRONGFUL EXCLUSIONARY CONDUCT

106.    As a result of the coordinated action and collaboration, Quest and Phadia began to contact physicians and third-party payors, among other parties, about the business practices of primary care physicians and UAS in their participation in the market for allergy testing and

allergen immunotherapy for seasonal and perennial allergies.   Quest and Phadia contacted insurance companies and managed care health plans through representatives of those organizations, including fraud investigators, provider relation representatives, and medical directors.   Quest has attempted to restrain competition in every local market in the nation and with a specific intent to monopolize those markets with its coordinated actions with Phadia and other co-conspirators. The result of this activity has constrained competition in all 25 states where Plaintiffs do business based on eliminated or reduced reimbursement by Humana, Aetna, and Cigna, as well as the local markets of Texas, Arkansas, Florida, Georgia, Illinois, Kansas, Kentucky, Louisiana, North Carolina, Oklahoma, Pennsylvania, South Carolina, and West Virginia through denied or reduced reimbursement by state payors in those states.

107.    Among other things, Quest and its co-conspirators attempted to persuade, entice, or coerce these representatives of third-party payors through use of materials distributed by board-certified allergists, AANMA, Phadia and Quest, falsely suggesting that those organizations defined the standard of care for allergy testing and allergen immunotherapy and that primary care physicians were not adequately trained or qualified to perform allergy testing and allergen immunotherapy.   These same actors also falsely stated that primary care physicians' reliance on the services of UAS was inappropriate, that primary care physicians were engaged in billing fraud and "pass through billing," that the practice of "home immunotherapy" was "investigational" and should not be reimbursed.   If a third-party payors expressed reluctance to stop doing business with primary care physicians or UAS, Quest and Phadia, AANMA, AAAAI, ACAAI, and JCAAI members and representatives suggested that those payors should reduce the amount paid to competitors for allergy skin testing under CPT Code 95004 and the preparation of immunotherapy under CPT Code 95165, but not reduce payment for shot administration in a

board-certified allergists' office under CPT Codes 95115 and 95117 or for allergy blood testing under CPT Code 86003.  The goal of these suggested price changes was to disproportionately reduce payment to Quest and Phadia's competitors.  Quest and its co-conspirators further suggested to third-party payors that they should restrict primary care physicians from performing allergy skin testing and limit them to refer their patients to reference laboratories for allergy blood testing, such as ImmunoCAP testing, which are billed under CPT Code 86003 and sold by Quest, instead of paying those physicians for allergy testing, i.e. skin prick tests under CPT Code 95004.

108.    For example, representatives of Phadia met with managed health plans in Texas in an effort to convince or coerce them not to do business with primary care physicians or UAS in the market for allergy testing and allergen immunotherapy—in coordination with Quest. Nothing prevents primary care physicians from providing allergy treatment and immunotherapy to their patients.  A specialist certification is not required by the standard of care in Texas nor any other state in which Plaintiffs operate.  Centers for Medicare and Medicaid Services pays for allergy testing and allergen immunotherapy for primary care physicians, as do Medicaid plans administered by each individual state.  Yet, Quest and its co-conspirators falsely claimed that primary care physicians are incapable of providing allergy testing and allergen immunotherapy to their patients and are determined to shut primary care physicians and businesses like UAS out of the market. Managed care plans are paid annual on a per capita basis from the state health and human services commission, which requires them to pay all covered claims under federal and state Medicare and Medicaid regulations.

109.    Defendants have had success targeting these organizations.  Representatives of Phadia met with representatives of Texas Health and Human Services and Superior to convince

those entities to restrict reimbursement of skin prick testing performed by primary care physicians in favor of blood testing, including sales of Phadia's ImmunoCaps—with the assistance and coordination of Quest. Subsequently, Superior began denying all claims submitted by the businesses of primary care physicians for allergy skin testing and allergen immunotherapy for more than 18 primary care providers doing business with UAS, some of whom are AAAPC members. In all more than 200 claims have been denied, totaling more than $500,000 in lost revenue to those providers and UAS from Superior alone. Phadia and Quest representatives since utilized their success with Superior's policy change to approach physicians and clinics to convince them not to do business with Plaintiffs. For example, one Phadia district manager encouraged his clinical sales consultants to use the policy change to regain lost business, noting that and Phadia had been waiting for that letter for three years. Additionally, Phadia and Quest coordinated their efforts with other payors, including Arkansas Blue Cross and Blue Shield, to attempt to convince them to restrict the market for allergy testing and allergen immunotherapy by refusing to pay primary care physicians and those doing business with UAS.

110.    As a direct result of Defendants' conduct, AAAPC members and UAS have been required to withdraw from certain local markets, including but not limited to the following areas: Chicago-Joliet-Naperville, IL-IN-WI Metropolitan Statistical Area; Hagerstown-Martinsburg, MD-WV Metropolitan Statistical Area; Wheeling, WV Metropolitan Statistical Area; Gainesville, FL Metropolitan Statistical Area; Orlando–Kissimmee–Sanford, FL Metropolitan Statistical Area; Tampa–St. Petersburg–Clearwater, FL Metropolitan Statistical Area; Lakeland-Winter Haven, FL Metropolitan Statistical Area; Monroe, LA Metropolitan Statistical Area; Fort Polk South, LA Micropolitan Statistical Area; Lake Charles, LA Metropolitan Statistical Area; Kansas City, KS-MO Metropolitan Statistical Area; Wichita, KS Metropolitan Statistical Area;

Louisville-Jefferson County, KY-IN Metropolitan Statistical Area; Lexington-Fayette, KY Metropolitan Statistical Area; Tucson, AZ Metropolitan Statistical Area; Phoenix-Mesa-Glendale, AZ Metropolitan Statistical Area; Yuma, AZ Metropolitan Statistical Area; Youngstown–Warren–Boardman, OH–PA Metropolitan Statistical Area; Canton–Massillon, OH Metropolitan area; Gaffney, SC Micropolitan Statistical Area; Greenville-Anderson-Mauldin, SC Metropolitan Statistical Area; and Columbia, SC Metropolitan Statistical Area.  As a result, Defendants no longer face any significant competition in these markets and have increased their market share in these markets above 70% for allergy testing and allergen immunotherapy, as well as in other markets in which Plaintiffs continue to operate but have been hindered.  Quest and its co-conspirators' conduct is still ongoing which is resulting Quest and its co-conspirators' further increased market share and injury to Plaintiffs.  Phadia and Quest have also been able to charge super-competitive prices during the relevant time, often exceeding 150-250% of other allergy blood tests and more than 300% of allergy skin tests with negligible loss in market share.

111.    Quest and its co-conspirators' conduct has harmed competition and consumers. As a result of driving the lower cost UAS and primary care physicians from the market and reducing supply, consumers in many markets must choose between paying the inflated price charged by Quest and its co-conspirators for allergy testing or allergen immunotherapy, or going without those treatments.  For example, consumers who previously had available to them the cheaper and more convenient allergy skin test in their primary care physician's office must either pay for a more expensive allergy blood test, such as Phadia's ImmunoCap test through a reference laboratory like Quest, or a more expensive skin test performed by a board-certified allergist than if performed by their primary care physician.  Additionally, a smaller number of consumers have the less expensive allergen immunotherapy performed by a primary care

physician available to them than the more costly allergen immunotherapy performed by a board-certified allergist.  Quest and its co-conspirators' conduct also imposes additional costs on consumers in terms of longer travel times, in office waiting times, more expensive and less useful medications, additional office visits and emergency room visits, and lost work and school days from a decline in effective care.

### PLAINTIFFS HAVE BEEN DAMAGED BY THE DEFENDANTS' ACTIONS

112.    Plaintiffs have been damaged, and will continue to be damaged, by actions taken by Quest and their co-conspirators on a nationwide basis to boycott and restrict competition and output from AAAPC members and UAS and conspire to monopolize the market for allergy testing.  The direct result of Quest and its co-conspirators' actions and the encouragement of AANMA, Quest, Phadia, and board-certified allergists led to coercion of hundreds of physicians and practice groups to exit the market.  These actions also included persuading, enticeing, and coercing insurance companies mananaged care organizations like Superior, Parkland, Humana, Blue Cross Blue Shield of North Carolina, Blue Cross Blue Shield of Louisiana, Capital Blue Cross of Pennsylvania, Highmark of Pennsylvania, and Blue Cross/Blue Shield of Kansas to avoid or stop reimbursing primary care physicians altogether; and other insurance companies like Aetna, Cigna, Arkansas Blue Cross and Blue Shield, Blue Cross Blue Shield of Texas, Blue Cross Blue Shield of Florida, and Anthem Blue Cross Blue Shield of Kentucky, to change and reduce the amounts they are willing to pay primary care physicians.

113.    As a direct result of Quest and its co-conspirators' actions, AAAPC members and UAS have lost revenue and corresponding profits that they would have generated but for the actions of Quest and its co-conspirators.  AAAPC and UAS have been forced to expend substantial resources to ensure that those they do business with do not terminate existing

agreements and have also experienced difficulty in entering into business relationships with others because of Quest and its co-conspirators' anticompetitive campaign.

114.   UAS has been damaged by questions and resistance from its existing physician and practice group partners as well as from prospective business partners, insurance companies, and consumers.  The result has been most noticeable in terms of lost revenue and corresponding lost profit for services that would have otherwise been provided to physicians, which exceeds $200 million in lost profits.  The lost revenue and profit is determined both by a decrease in services to existing contractual relationships with physicians, as well as loss of expected revenue and profit from new contracts that did not materialize.

115.   UAS has also been damaged by a direct boycott on the part of board-certified allergists and their trade organizations and co-conspirators, including AANMA, AAAAI, ACAAI, and JCAAI and their partnership with Phadia and Quest.  Phadia's agreements with its co-conspirator, Quest, not to sell ImmunoCaps to UAS prevents UAS from engaging in blood testing and eliminates UAS's ability to compete further in allergy testing and immunotherapy markets, including the diagnosis and treatment of food allergies.

116.   UAS and AAAPC members have experienced damages in terms of out-of-pocket expenses, lost profit, and loss in value of their business.  Plaintiffs anticipate that UAS, AAAPC, and AAAPC members have experienced additional damages, but such damages are difficult to determine at this time because Plaintiffs' investigation into the extent of the damage they have suffered at the hands of Quest is ongoing—since they just discovered Quest's coordinated activity through discovery.  Also, much of the additional damage that UAS, AAAPC, and AAAPC members have suffered is not easily calculable, such as damage to their goodwill and to the patient-physician relationship.

117. AAAPC, for its part, has suffered significant damages that exceed $2 million. These damages consist of lost revenue from members who are no longer active in AAAPC because Quest and its co-conspirators' conduct illegally forced those physicians to stop offering allergy testing and immunotherapy services to patients. Separately, these damages emanate from false exigencies precipitated by Quest and its co-conspirators' illicit conduct, which have required AAAPC to divert resources away from supporting member physicians and towards combating the improper and inaccurate information campaigns mounted by Quest, Phadia, and their co-conspirators with insurers, regulators, and legislators alike.

## COUNT ONE

## SHERMAN ACT § 1 VIOLATION

118. Plaintiffs incorporate by reference paragraphs 1 through 117 as if fully alleged herein.

119. At all times relevant to the Complaint, Quest and its co-conspirators have combined and conspired to eliminate competition and reduce supply and increase prices in the market for allergy testing and allergen immunotherapy for seasonal and perennial allergies in CBSAs throughout the United States, including within the State of Texas and other states, including Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia. Quest and its co-conspirators' actions include restricting participation in the market for all physician and non-physician services provided by physicians and technicians at the primary care level, including AAAPC members and UAS. In furtherance of their conspiracy, Quest and its co-conspirators have agreed to use false and misleading information to engage in a coordinated

nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors to Quest, Phadia, and board-certified allergists and their businesses.   In furtherance of their conspiracies and illegal agreements, Quest and its co-conspirators have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and other third parties in an attempt to persuade, entice, or coerce them not to do business with AAAPC members, UAS, and similar competitors, to fix prices to competitively disadvantage these competitors to discourage competition in the market, and to divide the market between the co-conspirators.

120.   Quest and its co-conspirators' actions are a *per se* violation of the Sherman Act. Quest is the largest and most powerful reference laboratory in the country, and its co-conspirators include all three national allergy trade associations (representing virtually all board-certified allergists), as well as the largest manufacturer for allergy blood tests, Phadia--collectively a dominant group of horizontal competitors with substantial market power in the market for allergy testing and allergen immunotherapy.   Quest and its co-conspirators have engaged in joint collaborative action to destroy their legitimate competition by participating in a group boycott, seeking to restrict competition and supply, and encouraging and engaging in price fixing in an attempt to deny competitors access to customers and markets that are necessary to compete.   Namely, Quest and its co-conspirators have coerced primary care physicians from doing business with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy testing and immunotherapy markets, and interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other

third-party payors and thereby their ability to receive reimbursement for the allergy care they provide.

121.    Additionally, Quest and its co-conspirators have divided the market among themselves, jointly controlling allergy blood testing with Phadia as the dominant supplier for allergy blood tests while Quest remains the dominant allergy blood test provider for reference laboratories. Further, both Phadia and Quest agreed with specialists, including board-certified allergists and their trade associations, to encourage primary care physicians to refer their patients to Quest for allergy blood testing and refer positive patients to board-certified allergists for allergy skin testing and allergen immunotherapy. Therefore, the co-conspirators divided the market to solidify each participant's place in the market as the dominant force for allergy testing and allergen immunotherapy, to the exclusion of UAS, primary care physicians, and similar competitors.

122.    Quest and its co-conspirators also engaged in price fixing, another *per se* Section 1 Sherman Act violation. Quest, board-certified allergists, and Phadia, among the other co-conspirators, advocated payors to fix prices that were higher for allergy blood testing while limiting reimbursement for allergy skin testing to a level below marginal cost, eliminating this competing service. Phadia and Quest knew that if they coerced payors to change their policies with threats of fraudulent activity and overutilization and limit allergy skin prick testing, they would eventually eliminate skin prick testing from primary care. When they used false and misleading information to advocate for 10 units for a limit on skin prick testing and 30 units for allergy blood testing, with such payors as Texas Medicaid and Arkansas Blue Cross and Blue Shield, for example, their intention was to exclude UAS and primary care physicians from the market.

123.    By using false and misleading information to discourage primary care physicians from working with UAS and to persuade, entice, and coerce third-party payors to deny or decrease reimbursements to those who do, Quest and its co-conspirators have similarly denied UAS elements access to markets that are necessary for it to compete.   There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, and they should be condemned.

124.    Strictly in the alternative, Quest and its co-conspirators' anticompetitive actions violate the Sherman Act under both a "quick-look" and full rule of reason analysis.   The agreements that Quest and its co-conspirators have entered, maintained, renewed and enforced with one another have had the purpose and effect of restraining competition for the provision of allergy testing and allergen immunotherapy, in terms of lower output, including by lower cost providers, causing higher prices.   As the result of Quest and its co-conspirators' conduct, some consumers have been deprived of the competition offered by AAAPC members, UAS, and other primary care providers in relevant geographic markets in Texas and other states, leaving patients to choose between paying higher prices for allergy testing or immunotherapy or going without. Quest and its co-conspirators' actions and statements demonstrate that they are motivated by the benefits of restricting competition, including protecting their turf and their profits and increasing their dominant position in the market.   Their actions are also not legitimate advocacy of their services or products, but are directed at restricting competition, to the ultimate harm of denial of patient choice, access to care, reduced output, and higher prices for consumers.

125.    As a direct and proximate result of Quest and its co-conspirators' past and continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered injury and

damages in an amount to be proved at trial.  These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

126.    Plaintiffs also seek injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

## COUNT TWO

## SHERMAN ACT § 2 VIOLATION FOR MONOPOLIZATION, ATTEMPTED MONOPOLIZATION, AND CONSPIRACY TO MONOPOLIZE

127.    Plaintiffs incorporate by reference paragraphs 1 through 126 as if fully alleged herein.

128.    At all times relevant to the Complaint, Quest and its co-conspirators have combined and conspired to attempt to eliminate competition, restrict output, and establish or maintain a monopoly in the markets for allergy testing and allergen immunotherapy for seasonal and perennial allergies in CBSAs throughout the United States, including within the State of Texas and other states, including Texas, Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.

129.    Quest and its co-conspirators jointly control over a 50% share in 702 of the 712 CBSAss in which they compete, including the relevant geographic markets at issue in this case. Quest and its co-conspirators therefore have joint monopoly power in those markets. Furthermore, Quest and Phadia control more than 50% of allergy testing in 323 CBSAs (53 Metropolitan and 270 Micropolitan) markets, sustained from their ability to erect barriers to competition either from Plaintiffs or even Quest and Phadia's co-competitors.  Quest and its co-conspirators' predatory and anticompetitive conduct was performed with the specific intent to

monopolize the markets for allergy testing and allergen immunotherapy and a dangerous probability of achieving and/or maintaining monopoly power.

130.    Quest and its co-conspirators' actions include seeking entry barriers and restriction on participation in the market for all physician and non-physician services provided by non-board-certified allergist physicians and their staff or contracting partners, including AAAPC members and UAS.  In furtherance of their conspiracy, they have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging the practice of allergy skin testing and allergen immunotherapy at the primary care level with the foreseeable result of eliminating competition in the allergy testing and allergen immunotherapy markets by primary care physicians and UAS.  Quest and its co-conspirators have conspired to these ends by targeting the physicians and UAS to eliminate them as competitors.  In furtherance of their conspiracies and illegal agreements, Quest and its co-conspirators have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and other third parties in an attempt to persuade, entice, or coerce them not to do business with AAAPC members and UAS, or to fix prices to competitively disadvantage these competitors to discourage competition in the market.

131.    The conspiracy to monopolize includes Quest, the largest reference laboratory in the country, and Phadia, the largest manufacturer of allergy blood tests with a greater than 80% market share sold in MSAs throughout the United States, all three national allergy trade associations that represent virtually all board-certified allergists—solidifying the actors of the conspiracy as a dominant group of horizontal competitors with substantial market power in the market for allergy testing.  Quest and its co-conspirators have engaged in joint collaborative action to destroy their legitimate competition by orchestrating a group boycott, encouraging price

fixing, and attempting to increase and maintain monopoly power in an attempt to deny consumers access to lower cost competitors.  Additionally, Quest and its co-conspirators have divided the market among themselves, jointly owning allergy blood testing by Phadia being the dominant player for allergy blood tests and Quest being the dominant player for reference laboratories. Further, both Phadia and Quest agreed with specialists, including board-certified allergists and their trade associations, to encourage primary care physicians to utilize allergy blood tests and refer positive patients to specialists for immunotherapy. Therefore, the co-conspirators divided the market to solidify each participant's place in the market as the dominant force for allergy testing and immunotherapy, to the exclusion of UAS and primary care physicians.

132.    As a direct and proximate result of Quest's past and continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proved at trial. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

133.    Plaintiffs also seek injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

## COUNT THREE

### TEXAS FREE ENTERPRISE AND ANTITRUST ACT VIOLATIONS

134.    Plaintiffs incorporate by reference paragraphs 1 through 133 as if fully alleged herein.

135.    At all times relevant to the Complaint, Quest and its co-conspirators have combined and conspired to eliminate competition and reduce supply and increase prices in the market for allergy testing and allergen immunotherapy for seasonal and perennial allergies in

CBSAs throughout the United States, including within the State of Texas and other states, including Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia. Quest and its co-conspirators' actions include restricting participation in the market for all physician and non-physician services provided by physicians and technicians at the primary care level, including AAAPC members and UAS.  In furtherance of their conspiracy, Quest and its co-conspirators have agreed to use false and misleading information to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors to Quest, Phadia, and board-certified allergists and their businesses.  In furtherance of their conspiracies and illegal agreements, Quest and its co-conspirators have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and other third parties in an attempt to persuade, entice, or coerce them not to do business with AAAPC members, UAS, and similar competitors, to fix prices to competitively disadvantage these competitors to discourage competition in the market, and to divide the market between the co-conspirators.

136.    Quest and its co-conspirators' actions are a *per se* violation of the Texas Free Enterprise and Antitrust Act ("TFEAA").  Quest and its co-conspirators include Quest, the largest and most power reference laboratory in the country, all three national allergy trade associations and represent virtually all board-certified allergists, as well as the largest manufacturer for allergy blood tests, Phadia, a dominant group of horizontal competitors with

63

substantial market power in the market for allergy testing and allergen immunotherapy. Quest and its co-conspirators have engaged in joint collaborative action to destroy their legitimate competition by orchestrating a group boycott, seeking to restrict competition and supply, and encouraging and engaging in price fixing in an attempt to deny competitors access to customers and markets that are necessary to compete. Namely, Quest and its co-conspirators have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy care they provide. They have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market. Additionally, Quest and its co-conspirators have divided the market among themselves, jointly owning allergy blood testing by Phadia being the dominant player for allergy blood tests and Quest being the dominant player for reference laboratories. Further, both Phadia and Quest agreed with specialists, including board-certified allergists and their trade associations, to encourage primary care physicians to utilize allergy blood tests and refer positive patients to specialists for immunotherapy. Therefore, the co-conspirators divided the market to solidify each participant's place in the market as the dominant force for allergy testing and immunotherapy, to the exclusion of UAS and primary care physicians.

137.    Quest and its co-conspirators also engaged in price fixing, another *per se* TFEAA violation. Quest, board-certified allergists, and Phadia, among the other co-conspirators, advocated payors to fix prices that were higher for allergy blood testing while limiting reimbursement for allergy skin testing to a level below marginal cost, eliminating this competing service. Phadia and Quest knew that if they coerced payors to change their policies with threats of fraudulent activity and overutilization and limit allergy skin prick testing, they would

eventually eliminate skin prick testing from primary care. When they used false and misleading information to advocate for 10 units for a limit on skin prick testing and 30 units for allergy blood testing, with such payors as Texas Medicaid, Parkland Community Health Plan, and Superior HealthPlan, for example, their intention was to exclude UAS and primary care physicians from the market.

138.    By discouraging primary care physicians from working with UAS and persuading, enticing, or coercing third-party payors to deny or decrease reimbursements to those who do, Quest and its co-conspirators have similarly denied UAS elements access to markets that are necessary for it to compete.  There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so Quest should not escape a *per se* designation.

139.    Strictly in the alternative, Quest and its co-conspirators' anticompetitive actions violate the TFEAA under both a "quick-look" and full rule of reason analysis.  The agreements that Quest and its co-conspirators have entered, maintained, renewed and enforced with one another have had the purpose and effect of restraining competition for the provision of allergy testing and allergen immunotherapy, in terms of lower output, including by lower cost providers, causing higher prices.  As the result of Quest and its co-conspirators' conduct, some consumers have been deprived of the competition offered by AAAPC members, UAS, and other primary care providers in relevant geographic markets in Texas and other states, leaving patients to choose between paying higher prices for allergy testing or immunotherapy or going without. Quest and its co-conspirators' actions and statements demonstrate that they are motivated by the benefits of restricting competition, including protecting their turf and their profits and increasing their dominant position in the market.  Their actions are also not legitimate advocacy of their

services or products, but are directed at restricting competition, to the ultimate harm of denial of patient choice, access to care, reduced output, and higher prices for consumers.

140.    As a direct and proximate result of Quest and its co-conspirators' past and continuing violations of the TFEAA, Plaintiffs have suffered injury and damages in an amount to be proved at trial. These actual damages should be trebled under Section 15.21 of the TFEAA.

141.    Plaintiffs also seek injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

142.    As required by Section 15.21(c) of the TFEAA, a copy of this Complaint shall be mailed to the Attorney General of Texas.

## COUNT FOUR

### TEXAS CIVIL PRACTICE & REMEDIES CODE, CHAPTER 134A MISAPPROPRIATION OF TRADE SECRETS

143.    Plaintiffs incorporate by reference paragraphs 1 through 142 as if fully alleged herein.

144.    Quest and Phadia's actions constitute the misappropriation of trade secrets belonging to UAS within the meaning of the Texas Uniform Trade Secret Act of the Texas Civil Practice & Remedies Code § 134A.007. A trade secret existed, namely the customer list of all of UAS's contracted providers and UAS's proprietary billing information.

145.    Quest acquired the trade secret through improper means by deceiving UAS as to Quest's intentions behind obtaining UAS's customer list and then disclosing and using the trade secret to Phadia without UAS's consent.

146.    When UAS provided Quest with the customer list, UAS did not intend for Quest to share the list with its co-conspirator to use the list as targets for their strategy of excluding UAS from the market. Quest knew that the customer list was acquired under circumstances

giving rise to a duty to maintain its secrecy, and Paul Gross, the corporate representative for Quest, recognized this fact in his deposition. He stated that UAS's email included a confidentiality provision: "This communication is intended only for the use of the addressee and may contain information that is privileged and confidential."

147.    Quest and its co-conspirators including Phadia also obtained UAS's proprietary billing information and business records that they subsequently shared with payors, including Arkansas Blue Cross in efforts to mischaracterize UAS's business practices.

148.    UAS suffered considerable injury to its business and its ability to compete in the marketplace caused by misuse of UAS's confidential and proprietary information misappropriated by Quest, including targeting of UAS's actual and potential customers with misleading and coercive tactics.

## COUNT FIVE

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

149.    Plaintiffs incorporate by reference paragraphs 1 through 148 as if fully alleged herein.

150.    In addition, or in the alternative, Quest and its co-conspirators' conduct described herein constitutes tortious interference with the existing agreements between UAS and its many physicians and practice groups as well as between AAAPC and its members and industry sponsors.  Quest and its co-conspirators' conduct, which was neither justified nor privileged, was intended to coerce physicians, practice groups, and hospital systems to terminate or reduce their contracts with UAS and AAAPC.  Quest and its co-conspirators' conduct constitutes willful and intentional acts of interference with those agreements and was done with malice.  Such conduct caused injury to AAAPC as an organization and to UAS by, among other things, reducing

business under these agreements causing a reduction in revenue and corresponding profits generated from these agreements and making it more difficult for AAAPC and UAS to conduct their operations and business and by causing them to expend considerable resources in order to ensure that agreements and business arrangements are not terminated as a result of Quest and its co-conspirators' actions.

## COUNT SIX

### TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS

151.    Plaintiffs incorporate by reference paragraphs 1 through 150 as if fully alleged herein.

152.    In addition, or in the alternative, Quest and its co-conspirators' conduct described herein constitutes tortious interference with AAAPC's and UAS's existing and prospective business relations.  There was a reasonable probability that, absent Quest and its co-conspirators' actions, AAAPC would maintained existing relationships with and would have entered into additional relationships with third parties, including primary care physicians and industry sponsors, and that UAS would have maintained existing relationships with and entered into additional business relationships with third parties, including other physicians, practice groups, hospital systems, and payors.  Quest and its co-conspirators intentionally interfered with these relationships by attempting to prevent payment to AAAPC members and other physicians who are not board-certified allergists who are assisted and supported by UAS, to scare them away from membership in AAAPC as well as to prevent physicians, practice groups, hospital systems, and payors from maintaining relationships with or entering into business with UAS.  Quest and its co-conspirators' conduct constitutes willful and intentional acts of interference and was done with malice.  Quest and its co-conspirators' conduct was independently tortious or unlawful for

the reasons described herein, including for violating and encouraging and participating others in violating the Sherman Act, the TFEAA, and the Texas Uniform Trade Secret Act, and making false, fraudulent, defamatory, and disparaging statements regarding AAAPC, AAAPC members, and UAS, and their businesses.  Quest and its co-conspirators' interference proximately caused injury to AAAPC and UAS by, among other things, reducing revenue and corresponding profits from these business relationships and making it more difficult to conduct operations and causing AAAPC and UAS to expend considerable resources in order to further their business.

## COUNT SEVEN

## CIVIL CONSPIRACY

153.    Plaintiffs incorporate by reference paragraphs 1 through 152 as if fully alleged herein.

154.    In addition, or in the alternative, Quest and its co-conspirators' conduct described herein constitutes a civil conspiracy to violate the Sherman Act and the Texas Free Enterprise and Antitrust Act, as well as to tortiously interfere with Plaintiffs' current contracts and existing and prospective business relations and to misappropriate UAS's trade secrets.  Quest and its co-conspirators have combined and conspired to eliminate competition for the provision of allergy testing and allergen immunotherapy and the associated support services at the primary care level, including services provided by AAAPC members and UAS.  In furtherance of their conspiracy, Quest and its co-conspirators have agreed to engage in a coordinated campaign to restrict competition by discouraging physicians and providers at the primary care level from the practice of allergy testing and allergen immunotherapy by targeting the physicians themselves and by targeting their businesses, including their use of UAS to become competitors with Quest, Phadia, and board-certified allergists and their businesses.  In furtherance of their conspiracies and illegal

agreements, Quest and its co-conspirators have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and third party payors in Texas and elsewhere in an attempt to convince those persons and entities to engage in a group boycott of the services of AAAPC members and UAS and to fix prices for these services to discourage competition and to attempt to maintain and further monopolize the markets for allergy testing and allergen immunotherapy.  Quest and its co-conspirators have also taken actions to interfere with Plaintiffs' current contracts and prospective business relationships.  As a direct result of the overt acts taken in furtherance of Quest and its co-conspirators' conspiracy, Plaintiffs have suffered considerable injury to their businesses and their ability to compete in the marketplace.

## APPLICATION FOR PERMANENT INJUNCTIVE RELIEF

155.    Plaintiffs incorporate by reference paragraphs 1 through 154 as if fully alleged herein.

156.    The actionable conduct of Quest and its co-conspirators over the past few years has threatened and is causing irreparable harm to AAAPC members and UAS that continues to this day.  Since filing the federal antitrust complaint against Quest's co-conspirators, and before Plaintiffs discovered Quest's role in the conspiracy, additional third party payors have expressed the same concerns raised by Quest and its co-conspirators, threatening to remove primary care physicians and UAS from the market entirely, at the suggestion of the actors of the conspiracy.

157.    Upon judgment in this cause, Plaintiffs request the Court to enter a judgment permanently enjoining and restraining Quest, and its agents, servants, employees and all persons acting under, and in concert with, or for it, from: (i) using or sharing UAS's trade secrets or confidential or proprietary information, (ii) engaging in contacts or discussions with insurance companies, managed care organizations, or other third-party payors to achieve restrains on who

may perform allergy testing or allergen immunotherapy or to set prices for allergy skin testing or immunotherapy, (iii) contacting, discussing, or disseminating misleading materials to third-party payors, physicians, or others in the industry regarding the business practices or services of AAAPC members or UAS; or (iv) taking action or encouraging others to take action restrained above or otherwise to harm AAAPC's, AAAPC members', or UAS's businesses.

## ATTORNEYS' FEES

158.    Plaintiffs incorporate by reference paragraphs 1 through 157 as if fully alleged herein.

159.    The Texas Civil Practice and Remedies Code § 134A.005, 15 USCA § 15, and TFEAA § 15.21 all provide for the recovery of attorneys' fees and costs of suit in private enforcement actions under the antitrust laws.   Plaintiffs therefore seek recovery of their attorneys' fees on this statutory basis as a remedy for the costs they have incurred as a result of Quest's conduct.

## LIMITATIONS

160.    Plaintiffs incorporate by reference paragraphs 1 through 159 as if fully alleged herein.

161.    On October 26, 2017, Plaintiffs communicated with Quest regarding their claims against Quest and their recent discovery that Quest is involved in the conspiracy to exclude Plaintiffs from the market. Quest responded on November 3, 2017 with allegations that Plaintiffs' claims are barred by limitations and that Plaintiffs can no longer add additional parties to the already-existing federal antitrust case.

162.    Plaintiffs, however, did not discover that Quest was engaged in tortious and conspiratorial activity until 2016 through third party discovery responses in Plaintiffs' antitrust lawsuit against AANMA and Thermo Fisher. The reason behind this delayed discovery is that

Quest fraudulently concealed their illegal activities from Plaintiffs by, among other acts, intentionally misleading Plaintiffs to obtain confidential information, not disclosing the nature of their relationship with Plaintiffs' competitors and by not disclosing documents and not complying with Plaintiffs' subpoena requests made in the federal antitrust action. Thus, despite exercising reasonable diligence, Plaintiffs would not have been able to discover that Quest was engaged in this illegal activity until it received the third party discovery in 2016.

163.    Because Plaintiffs expect that Quest will attempt to evade its responsibility for Plaintiffs' injuries from the anticompetitive campaign lodged against it by alleging that the statute of limitations have run for Plaintiffs' claims, Plaintiffs assert that such defense is barred by tolling or accrual doctrines—including but not limited to, the discovery rule, fraudulent concealment, unclean hands, estoppel, the continuing tort doctrine, and the continuing violations doctrine.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury pursuant to FED. R. CIV. P. 38(b) of all issues triable of right by jury.

## PRAYER FOR RELIEF

Therefore, Plaintiffs demand judgment as follows:

A.    Award Plaintiffs actual and economic damages in an amount to be proven at trial, to be trebled with interest;

B.    Award Plaintiffs exemplary damages in an amount to be proven at trial;

C.    Award Plaintiffs their attorneys' fees and costs of this suit;

D.    Issue permanent injunctive relief as described herein; and,

E.    Award such other further relief as the Court deems just and proper.


DATED:  December 28, 2017.

Respectfully submitted,


**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By:  /s/ Casey Low
      Casey Low
      Texas Bar No. 24041363
      Dillon Ferguson
      Texas Bar No. 06911700
      Benjamin L. Bernell
      Texas Bar No: 24059451
      Liz Kozlow Marcum
      Texas Bar No: 24078801
      401 Congress Ave., Suite 1700
      Austin, Texas 78701-4061
      Phone: (512) 580-9600
      Fax:    (512) 580-9601
      casey.low@pillsburylaw.com
      Dillon.ferguson@pillsburylaw.com
      Ben.bernell@pillsburylaw.com
      liz.marcum@pillsburylaw.com

**ATTORNEYS FOR PLAINTIFFS
AAAPC & UAS**