FILED
March 31, 2022
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Breanna Coldewey
DEPUTY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE and UNITED BIOLOGICS, L.L.C. d/b/a UNITED ALLERGY SERVICES, <br><br> *Plaintiffs,* <br><br> v. <br><br> QUEST DIAGNOSTICS, INCORPORATED, <br><br> *Defendant.* | Case No. 5:17-cv-1295-RCL |

## MEMORANDUM OPINION

In 2014, plaintiffs Academy of Allergy in Primary Care ("AAAPC") and United Allergy Services ("UAS") began filing lawsuits about an alleged conspiracy to exclude them from allergy-testing and allergen-immunotherapy markets. One of those cases made it to trial before this Court: Plaintiffs lost on all counts. Jury Verdict, *United Biologics, L.L.C. v. Allergy and Asthma Network/Mothers of Asthmatics, Inc.* (*AANMA I*), No. 5:14-cv-035 (RCL) (W.D. Tex. Mar. 26, 2018), ECF No. 563.

During that lawsuit, plaintiffs discovered information tying Quest Diagnostics, Incorporated ("Quest") to the conspiracy. They sued Quest separately for federal and state antitrust violations, misappropriation of trade secrets, tortious interference, and civil conspiracy. Compl., ECF No. 1. The Court originally dismissed these claims as time-barred. *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.* (*Quest I*), No. 5:17-cv-1295 (RCL), 2019 WL 919203 (W.D. Tex. Feb. 22, 2019). But the Fifth Circuit disagreed—the statutes of limitations did not bar plaintiffs' antitrust and trade-secrets claims. *Acad. of Allergy & Asthma in*

1

*Primary Care v. Quest Diagnostics, Inc.* (*Quest II*), 998 F.3d 190, 199, 201 (5th Cir. 2021). It reversed and remanded those claims. *Id.* at 202.

Quest now renews its motion to dismiss this lawsuit. Mot. to Dismiss, ECF No. 45. It argues that plaintiffs have failed to allege facts showing antitrust and trade-secrets violations. *Id.* Plaintiffs responded, ECF No. 48, and Quest replied, ECF No. 49. Upon consideration of the parties' filings, applicable law, and the materials attached to plaintiffs' complaint, the Court will **GRANT** defendant Quest's motion to dismiss for failure to state a claim.

## I. BACKGROUND[1]

Airborne allergies affect 50 to 60 million Americans. Compl. ¶ 12. Most people are all-too-familiar with the usual symptoms: sneezing, coughing, itching, or runny noses. But few sufferers receive treatment for those conditions. *Id.* Plaintiffs in this case—AAAPC and UAS—aimed to cut out the "large economic barrier[s]" to allergy treatment by giving primary care providers the information, technology, and materials needed to treat allergies in their own practices. *See* Compl. ¶ 14. This lawsuit concerns an alleged conspiracy by allergy-testing companies, board-certified allergists, and trade associations to impede UAS's business. *Id.* ¶ 11.

Allergy treatment involves a two-step process. First, a patient must be tested for allergies and prescribed a course of treatment. One means of testing is a skin-prick test, in which a technician administers "small amounts of antigen" to a patient's skin and records the reactions. *Id.* ¶ 23. A physician then interprets the skin-prick test's results and prescribes a course of treatment. *Id.* Alternatively, a patient can receive an allergy blood test. *Id.* ¶ 24. The patient's physician will refer her to a reference laboratory—like Quest—where she will have blood drawn. *Id.* After applying an allergy blood test to the patient's blood, the laboratory sends the results to the patient's

---

[1] These facts are taken from plaintiffs' complaint and assumed to be true for the purposes of a motion to dismiss. *Gregson v. Zurich Am. Ins. Co.*, 322 F.3d 883, 885 (5th Cir. 2003).

2

physician. *Id.* Phadia, Inc. ("Phadia") manufactures one of the most popular allergy blood tests in the United States—"ImmunoCAP" tests. *Id.* ¶ 24. To identify potential allergies, an ImmunoCAP test measures levels of antibodies in the blood across a panel of 28 to 30 allergens. *Id.* Again, the patient's physician interprets the results of an ImmunoCAP test to prescribe a course of treatment. *Id.* Blood tests are expensive. Plaintiffs allege that, in 2017, a blood test for regional allergens costs "approximately $900 per patient." *Id.* That cost is "more than triple the cost" of a skin-prick test covering the same allergens. *Id.*

Second, the patient must undergo treatment through allergen immunotherapy. In allergen immunotherapy, a patient receives increasingly concentrated doses of diluted antigens. *Id.* ¶ 25. Most patients receive this treatment through subcutaneous shots (i.e., "allergy shots" or "allergy injections"). *Id.* ¶ 26. Board-certified allergists "routinely require" patients to receive allergy shots in person—meaning that patients must travel to an allergist's office "two times a week . . . for up to three years of immunotherapy treatment." *Id.* ¶ 27. With fewer than 3,000 board-certified allergists across the country, this option may not be available for low-income patients or for those who live in rural areas. *Id.* ¶ 12. But "[m]any physicians . . . allow some of their patients to self-administer allergy shots," since it is "a safe and effective method for certain patients" and "less expensive." *Id.* ¶ 26.

UAS saw the inefficiencies in these processes as an opportunity. It took responsibility for "all of the non-physician services necessary" for allergy treatment—among other materials, "technicians, allergy testing kits, [and] antigens for immunotherapy mixing." *Id.* ¶ 30. UAS then contracted with "physicians, practice groups, and hospitals" to provide skin-prick testing and allergen immunotherapy to their practices. *Id.* ¶¶ 30, 33. But, as the new player on the block, UAS faced heavy resistance from already-established companies and board-certified allergists.

3

And so began a "turf war" in the field and (eventually) in the federal courts. By 2011, Tonya Winders ("Winders")—a former team leader at Phadia, and later CEO of Allergy and Asthma Network/Mothers of Asthmatics, Inc. ("AANMA")—was aware of UAS's presence in these markets. *Id.* ¶ 48. Winders circulated "talking points" to Phadia and Quest employees about UAS that included allegedly "false warnings about patient safety, medical and legal liability, and fraudulent billing [practices]." *Id.* Winders also sent strategy documents to Phadia, AANMA, board-certified allergists, and trade associations to "support ImmunoCAPs as the preferred tool for primary care testing," contacted the Texas Medical Board about UAS's activities, and reached out to third-party payors like Texas Medicaid, Humana, and Blue Cross Blue Shield to report UAS's purported fraud and abuse. *Id.* ¶ 53.

Around this time, UAS reached out to Quest about either (1) purchasing an ImmunoCAP instrument or (2) using Quest as a reference laboratory for patients. *Id.* ¶ 55. Phadia—and Winders—soon got word of this request. In a series of emails, Winders requested permission to "direct Quest to deny business relationships with UAS to prevent UAS's expansion." *Id.* ¶ 56. Phadia higher-ups agreed. *Id.* Winders then corresponded with a Quest employee and "agreed, on behalf of Phadia and Quest," to deny UAS's purchase request and to refuse to work with UAS in the future. *Id.* ¶ 57. Winders "warned [the Quest employee] that there would be consequences if Quest ever decided to supply or work with UAS." *Id.* Other employees at Quest and Phadia got wind of these emails and agreed to "spread the word" about the "agreement to combat and [eliminate] UAS as a market threat." *Id.*

Unaware of this behind-the-scenes maneuvering, UAS again emailed Quest about a referral program for allergy blood testing. *Id.* ¶ 60. The UAS employee attached a customer list to this email. *Id.* Quest emailed this list to several Phadia officials, who then passed it along to their

4

sales staff with instructions to "target UAS's customers with misleading information." *Id.* ¶¶ 60–61. Quest and Phadia sales representatives then began "working together" to discourage physicians from contracting with UAS by spreading "false and coercive claims of fraud, substandard care, and legal liability." *Id.* ¶ 64.

The alleged misconduct even reached the federal government. On November 23, 2011, the Office of the Inspector General at the federal Department of Health & Human Services ("OIG") issued an advisory opinion (the "OIG opinion") about a business model in which "an entity would furnish allergy testing and immunotherapy laboratory services within various primary care physicians' medical offices." ECF No. 1-1 at 44. OIG concluded that this hypothetical arrangement "could potentially generate prohibited remuneration" under the Social Security Act and lead to administrative sanctions. *Id.* at 44–45. UAS alleges that the OIG opinion was the result of a coordinated fraud—AANMA requested the opinion through a "shell company" named "United Allergy Labs" whose CEO had "no healthcare experience." *Id.* In UAS's telling, Quest and Phadia "wrongfully attribut[ed] the opinion to UAS" when corresponding with healthcare providers. *Id.* Phadia even "trained its entire ImmunoCAP sales force" and Quest sales representatives to tell providers that the OIG opinion applied to UAS. *Id.* ¶ 66.

But Quest and Phadia did not limit their alleged anticompetitive activity to healthcare providers. They went straight to the source—third-party payors. In meetings with Texas Medicaid and Arkansas Blue Cross Blue Shield, among others, Quest and Phadia lobbied to increase reimbursement for allergy blood tests and limit reimbursement for skin-prick tests. *Id.* ¶¶ 81–82; 90. They largely succeeded in these efforts. *See id.* Winders even sent a letter to "over 100 payors" referencing the OIG opinion and disparaging the "remote practice of allergy." *Id.* ¶ 93. She "included a link to the AAAPC website" in this letter and "encourag[ed] [third-party] payors

5

to audit and investigate" those physicians for excessive billing. *Id.*

Thus began this tortured litigation. In January 2014, UAS filed claims for tortious interference, civil conspiracy, and federal and state antitrust violations against a group of physicians. *Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy (AANMA I)*, No. 5:14-cv-035 (OLG), 2014 WL 12497080, at *2 (W.D. Tex. Sept. 8, 2014). Through the discovery process in that case, plaintiffs learned of Phadia, AANMA, and Winders's involvement and amended their complaint to add these defendants. *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc. (Quest II)*, 998 F.3d 190, 195 (5th Cir. 2021). Though Phadia and the trade associations settled out, AANMA and Winders's claims proceeded to a jury trial before this Court. *Id.* A unanimous jury found AANMA and Winders not liable on all counts. Jury Verdict, *AANMA I*, No. 5:14-cv-035 (RCL). Plaintiffs took nothing. *Id.* [2]

During the AANMA litigation, the plaintiffs discovered information that they believed implicated Quest in the alleged conspiracy. *Quest II*, 998 F.3d at 195. Because the deadline to join Quest to the AANMA litigation had passed, plaintiffs separately sued Quest for the same claims—tortious interference, civil conspiracy, and state and federal antitrust violations. *See* Compl. ¶¶ 118–54. In February 2019, this Court granted Quest's motion to dismiss on statute-of-limitations grounds. *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc. (Quest I)*, No. 5:17-cv-1295 (RCL), 2019 WL 919203 (W.D. Tex. Feb. 22, 2019). The Fifth Circuit affirmed in part and reversed in part. *Quest II*, 998 F.3d at 202. Plaintiffs' tort claims were time-barred. *Id.* at 199. But plaintiffs had alleged an "overt act" resetting the statute of limitations

---

[2] Despite this setback, plaintiffs continued litigating this alleged conspiracy in various federal courts. *See, e.g., Acad. of Allergy & Asthma in Primary Care v. La. Health Serv. & Indem. Co.*, No. 18-cv-399 (CJB), 2021 WL 5029418 (E.D. La. May 14, 2021); *Acad. of Allergy & Asthma in Primary Care v. Superior Healthplan, Inc.*, No. 5:17-cv-1122 (FB), 2020 WL 10051764 (W.D. Tex. Dec. 15, 2020); *Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*, No. 3:19-cv-180 (PLR), 2020 WL 8254263 (E.D. Tenn. Aug. 12, 2020).

6

for their Sherman Act and state-law antitrust claims. *Id.* And since plaintiffs "could not have discovered their misappropriation injury using reasonable diligence," the trade-secrets claim too survived. *Id.* at 201. The Court now turns to Quest's motion to dismiss these remaining claims.

## II. LEGAL STANDARD

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A plaintiff must plead factual content permitting the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court "should assume the veracity" of well-pleaded factual allegations and draw reasonable inferences in the plaintiff's favor. *Gregson*, 322 F.3d at 885. When considering a motion to dismiss, a court is "limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). Here, plaintiffs have attached numerous emails and presentations to their complaint, which the Court has considered in its decision.

## III. DISCUSSION

After the remand in this case, four claims remain in plaintiffs' complaint: (1) a Sherman Act § 1 violation for conspiring to restrain trade; (2) a Sherman Act § 2 violation for conspiring to monopolize; (3) Texas-law antitrust claims for the same conduct; and (4) a Texas-law misappropriation of trade secrets claim. Plaintiffs have not plausibly alleged any of these claims. The alleged "allergy testing and immunotherapy" market is comprised of two complementary services—in reality, plaintiffs have alleged two markets. The Court cannot infer that plaintiffs held market power based solely on conclusory market-share allegations. Plaintiffs' monopoly

7

allegations falter as well—their alleged "joint monopoly" is an oligopoly, not a monopoly. And, finally, plaintiffs did not keep their alleged "trade secret" a secret. The Court will therefore **GRANT** Quest's motion and **DISMISS** these remaining claims without prejudice.

### A. Sherman Act § 1 Claim

To state a § 1 claim, a plaintiff must show that a defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a relevant market. *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008). Some restraints—not applicable here—are unreasonable *per se* because they "would always or almost always tend to restrict competition and decrease output." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (citation omitted).[3] Otherwise, alleged restraints are analyzed under the "rule of reason." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Plaintiffs must show "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). If they meet this burden, then defendants must identify "a procompetitive rationale for the restraint." *Id.* The plaintiffs must then show that "any procompetitive effects could be achieved through less anticompetitive means." *Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 492 (5th Cir. 2021).

In its motion, Quest argues that plaintiffs have not defined a relevant market or proven that the alleged conspiracy restrained trade in that market. The Court agrees. "Without a definition of [the] market there is no way to measure [a defendant's] ability to lessen or destroy competition."

---

[3] "Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable *per se*." *Am. Express Co.*, 138 S. Ct. at 2284 (quoting *Bus. Elecs. Corp.*, 485 U.S. at 723). This case does not present a horizontal restraint. Plaintiffs have alleged (1) that Quest and Phadia agreed not to sell blood-testing services and (2) that Quest, Phadia, and co-conspirators coerced third-party payors and primary care physicians to stop doing business with UAS. *See* Compl. ¶¶ 120–23; Pls.' Resp. 15–17. These vertical arrangements—between firms not competing with one another—do not qualify as unreasonable *per se*.

8

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965). Plaintiffs allege that Quest, Phadia, board-certified allergists, and various trade associations conspired to restrain trade in the "allergy testing and immunotherapy" market. This ill-defined market, in reality, describes two separate markets for two complementary services. But that is not the only problem. Plaintiffs must allege that this conspiracy restrained trade. They offer conclusory allegations and unreasonable inferences to support this claim.

The Court will, therefore, dismiss plaintiffs' complaint. But because plaintiffs could remedy these deficiencies through an amended complaint, the Court will not dismiss the overall action—only the complaint. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

### i. Defining the Relevant Market

To begin, plaintiffs have alleged two markets in this case—the markets for allergy testing and allergen immunotherapy. A court "cannot properly apply the rule of reason without an accurate definition of the relevant market." *Am. Express Co.*, 138 S. Ct. at 2285; *accord Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007). A relevant market consists of (1) a product market and (2) a geographic market. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 625 (5th Cir. 2002). To define a relevant product market, a plaintiff must show that products within that market are reasonably interchangeable and that there is a "cross-elasticity of demand"—i.e., that increased prices for one product will increase prices for its substitutes. *Apani Sw.*, 300 F.3d at 625. When an alleged market does not encompass all "interchangeable substitute products," it is "legally insufficient." *Id.*

Plaintiffs find many ways to gussy up their alleged market. Sometimes, they refer to the "market for allergy testing and allergen immunotherapy." *E.g.*, Compl. ¶¶ 6, 7, 8, 22, 30, 93, 106. Other times, they refer to the "allergy testing and immunotherapy markets." *E.g.*, *id.* ¶¶ 1, 31,

9

115, 128. Several paragraphs use both "market" and "markets." *E.g.*, *id.* ¶¶ 8, 13, 38, 41, 120, 130. Or it may be the "market for allergy blood testing," standing alone. *E.g.*, *id.* ¶¶ 44, 63, 112, 131. But all the lipstick in the world would do little on this pig.

Plaintiffs' problem is that they have defined a market of two complementary services. "Complements" refer to goods or services "most efficiently made or used together." 2B Philip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 565a (4th ed. 2014). As an illustration:

> An example of complements is gasoline and tires. A driver needs both gasoline and tires to drive, but they are not substitutes for each other, and so the sale price of tires does not check the ability of a gasoline firm (say a gasoline monopolist) to raise the price of gasoline above competitive levels.

*Am. Express Co.*, 138 S. Ct. at 2295 (Breyer, J., dissenting). Lower gasoline prices would, in fact, "induce more driving," thereby "increas[ing] the demand for tires"—"so as the price of gasoline goes *down*, [the price] for tires will *rise*." 2B Areeda & Hovenkamp ¶ 565a (emphasis added). As the authors of the preeminent antitrust treatise state: "Grouping complementary goods into the same market" is "economic nonsense." *Id.*

Allergy-testing and allergen-immunotherapy services complement one another. Allergen immunotherapy requires a patient to be tested—otherwise, a physician does not know the patient's allergies. The utility of allergy testing is, in turn, based on the possibility of allergen immunotherapy. The services are not reasonably interchangeable. One cannot exchange immunotherapy for testing (or vice versa). Nor is there a cross-elasticity of demand between the services. Lower-cost allergy testing would increase patients' demand for tests, which would increase demand for allergen immunotherapy, leading to higher-cost allergen immunotherapy. *Cf.* 2B Areeda & Hovenkamp ¶ 565a (explaining that "as the price for gasoline goes down, the price for tires will rise"). It would be "economic nonsense" to group these services together for antitrust

10

purposes.

Put simply, plaintiffs have alleged two relevant markets in this case: (1) allergy testing and (2) allergen immunotherapy. They concede as much in their complaint and their briefing. *See* Compl. ¶¶ 8, 13, 38, 41, 120, 130 (using both "market" and "markets"); Pls.' Resp. 15, ECF No. 48 ("Plaintiffs do allege two different but related product markets—allergy testing and allergen immunotherapy."). The allergy-testing market encompasses both skin-prick tests and allergy blood tests, which are reasonably interchangeable substitutes.

### ii. *Alleged Restraints on Trade*

Next, the Court turns to the alleged restraints on trade. Plaintiffs must allege that a conspiracy "caused anticompetitive effects or 'created the potential for anticompetitive effects.'" *Impax Lab'ys*, 994 F.3d at 492 (quoting *Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 310 (5th Cir. 1997)). Anticompetitive effects are those "harmful to the consumer." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). A plaintiff can satisfy their initial burden directly or indirectly. Direct proof is "proof of actual detrimental effects [on competition]." *Am. Express Co.*, 138 S. Ct. at 2284 (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986)). "Think increased prices, decreased output, or lower quality goods." *Impax Lab'ys*, 994 F.3d at 493. Indirect proof is "proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express Co.*, 138 S. Ct. at 2284.

At this stage in the litigation, plaintiffs need only allege facts that "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. But the threshold of "plausibility" can still bite. As the Supreme Court has cautioned, a district court "must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 558 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519,

11

528 n.17 (1983)). Plaintiffs allege myriad anticompetitive activities by Quest, Phadia, AANMA, and other co-conspirators. But these allegations fall short. The Court will take the allegations of direct and indirect proof in order.

### a. *Direct Proof of Anticompetitive Effects*

Plaintiffs argue that Quest, Phadia, and co-conspirators "excluded UAS from the allergy[-]testing market" through "their concerted refusal to deal with UAS and successful efforts to convince physicians." Pl.'s Resp. 16. Allegations in the complaint follow this line of reasoning. For example:

- Quest and Phadia have "been able to charge [supra]competitive prices during the relevant time, often exceeding 150–250% of other allergy blood tests and more than 300% of allergy skin tests with negligible loss in market share." Compl. ¶ 110.

- The conspiracy "has constrained competition in all 25 states where [p]laintiffs do business based on eliminated or reduced reimbursement by [third-party payors]." *Id.* ¶ 106.

- As a "direct result" of the conspiracy, "AAAPC members and UAS have been required to withdraw from certain local markets, including [listing markets]." *Id.*

These allegations do not indicate the "actual, sustained adverse effects on competition" required to show an unreasonable restraint on trade. *Ind. Fed'n of Dentists*, 476 U.S. at 461.

Start with pricing.[4] Plaintiffs' allegations show increased prices for blood tests. But "price increases, without more, do not constitute supracompetitive pricing." *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021). "[A] firm's comparatively high price may simply reflect a

---

[4] It remains unclear whether a plaintiff must allege (1) supracompetitive prices *and* (2) restrained output, or whether an allegation of supracompetitive prices will suffice. Some federal courts of appeal require evidence of both. *See Theme Promotions, Inc. v. News Am. Marketing FSI*, 546 F.3d 991, 1001 (9th Cir. 2008); *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005); *Coastal Fuels of P.R., Inc. v. Caribbean Petrol. Corp.*, 79 F.3d 182, 196 (1st Cir. 1996). Other cases suggest that supracompetitive prices alone will pass muster. *See Am. Express Co.*, 138 S. Ct. at 2288; *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97–98 (2d Cir. 1998). Without weighing in on this issue, the Court will assume that supracompetitive pricing—standing alone—may constitute evidence of anticompetitive effects.

superior product." *Harrison Aire*, 423 F.3d at 381; *accord Am. Express Co.*, 138 S. Ct. at 2288 ("Amex's increased merchant fees reflect increases in the value of its services and the costs of its transactions, not an ability to charge above a competitive price."); *Blue Cross & Blue Shield United of Wis. V. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) (Posner, J.) (noting that higher prices "may reflect a higher quality more costly to provide"). According to plaintiffs, "85–90%" of the allergy blood tests used nationwide are Phadia's ImmunoCAP tests. Compl. ¶ 20. Even if Quest charges "150–250%" more for ImmunoCAP testing compared to other blood tests, *id.* ¶ 110, this difference may stem from Phadia's superior product.

The allegation that Quest and Phadia charge "more than 300% of allergy skin tests" for testing services is similarly implausible. Compl. ¶ 110. First, no other allegations indicate that Quest or Phadia perform skin-prick tests. *See, e.g., id.* ¶ 36 (noting that "allergy skin testing and immunotherapy [is] performed by board-certified allergists"); *id.* ¶ 81 (alleging that "Phadia[] and Quest's goal was to eliminate allergy skin testing from the market"). Second, this comparison could simply be noting that blood tests are three times more expensive than skin tests. But the two services—though achieving the same end—have different processes. Again, "high price[s] may simply reflect a superior product," especially for two heterogenous services. *Harrison Aire*, 423 F.3d at 381.

Nor do plaintiffs plausibly allege restricted output in the allergy-testing or allergen-immunotherapy markets. Plaintiffs allege that Quest's conspiracy "has constrained competition" and deprived markets of "competition offered by AAAPC members, UAS, and other primary care providers." Compl. ¶¶ 106, 124. But these allegations contradict plaintiffs' other submissions to the Court. According to plaintiffs' own exhibits, many "remote practice of allergy" labs competed with UAS at the time of these events. *See* ECF No. 1-1 at 6 (listing competitors); *id.* at 18–19

13

(listing other competitors and highlighting that roughly fifty doctors in Texas were "practicing allergy independently"). A court need not accept a complaint's factual allegations as true "insofar as they contradict exhibits to the complaint." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004); *cf. Mora v. Univ. of Tex. Sw. Med. Ctr.*, 469 F. App'x 295, 299 (5th Cir. 2012) (holding allegations implausible when "contradicted by the other facts alleged in the complaint").

Accordingly, plaintiffs have not plausibly alleged direct proof of anticompetitive effects.

### b. *Indirect Proof of Anticompetitive Effects*

The Court next turns to indirect proof. Indirect proof requires "proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express Co.*, 138 S. Ct. at 2284. Market power "is the ability to raise price profitably by restricting output." *Id.* at 2288 (citations omitted). A court usually infers market power "from the seller's possession of a predominant share of the market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992). Plaintiffs—in their brief in opposition—argue that "Quest and its co-conspirators possess market power to effectively restrain competition." Pls.' Resp. 16. This conspiracy allegedly erected barriers to entry through a "concerted refusal to deal with UAS and successful efforts to convince physicians." *Id.*

The problem? Plaintiffs have not alleged facts showing Quest, Phadia, and their co-conspirators' shares of the allergy-testing and allergen-immunotherapy markets. A court analyzing "the sufficiency of a plaintiff's market-share showings" must examine "how convincingly . . . the market has been defined." *FTC v. Facebook, Inc.*, No. 1:20-cv-3590 (JEB), 2021 WL 2643627, at *12 (D.D.C. June 28, 2021) (citing 2B Areeda & Hovenkamp ¶ 531). Plaintiffs' allegations, in this light, are inconsistent. Quest, Phadia, and co-conspirators "have increased their market share . . . above 70% for allergy testing and allergen immunotherapy." Compl. ¶ 110. At the same time, "Quest and its co-conspirators jointly control over a 50% share"

14

in "702 of the 712" Census-based statistical areas in which they operate. *Id.* ¶ 129. Or maybe Quest and Phadia "jointly control over 50%" of the singular "market for allergy testing and immunotherapy" in those areas. *Id.* ¶ 39. At another point, plaintiffs note that "Quest and Phadia control more than 50% of allergy testing in 323" of those statistical areas. *Id.* Phadia itself holds a "greater than 80% market share" in allergy blood tests. *Id.* ¶ 131. Simply put, the Court does not know which of these inconsistent figures it should assume to be true.

In any event, these allegations "would be too conclusory to plausibly establish market power." *Facebook*, 2021 WL 2643627, at *12. A court cannot infer market power from a bare assertion of market share. *See, e.g., Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (suggesting "a market share of at least fifty percent" is needed to find market power); *EuroTec Vert. Flight Solutions, LLC v. Safran Helicopter Engines S.A.A.*, No. 3:15-cv-3454 (KGS), 2019 WL 3503240, at *3 (N.D. Tex. Aug. 1, 2019) (deeming an allegation of "market share of over 50 percent" as "conclusory"). Quest also highlights that, in a companion case, allegations of a 47 to 58% market share failed to state a claim when plaintiffs did "not allege[] any facts regarding the number of competitors and barriers to entry." *Acad. of Allergy & Asthma in Primary Care v. La. Health Serv. & Indem. Co.*, No. 18-cv-399 (CJB), 2020 WL 4050243, at *10 (E.D. La. July 17, 2020). Plaintiffs' allegations of market share fall short of being plausible.

And even if the Court accepts the highest alleged figure—a 70% market share—plaintiffs have not indicated what this percentage measures. The allergy-testing market includes both blood and skin-prick tests. But the Court cannot tell whether an alleged 70% share refers to 70% of *revenue* or 70% of *tests performed*. "In differentiated markets, revenue may overstate the significance of the firm with the higher-priced product." 2B Areeda & Hovenkamp ¶ 535a; *accord*

15

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 5.2 (2010) ("In cases where one unit of a low-priced product can substitute for one unit of a higher-priced product, unit sales may measure competitive significance better than revenues."); *cf., e.g., Am. Tobacco Co. v. United States*, 328 U.S. 781, 794 (1946) (calculating market share by units of cigarettes produced). Allergy blood tests are "more than triple the cost" of skin-prick tests. Compl. ¶ 24. So, if Quest and UAS tested the same number of patients, Quest would receive 75% of the revenue to UAS's 25%. But their market shares by patients tested would be 50% each. Without knowing the denominator, the Court cannot adequately infer market power from these market-share allegations.

*      *      *

The Court will end its § 1 analysis here. Plaintiffs have not alleged facts directly proving anticompetitive effects in the allergy-testing or allergen-immunotherapy markets. Nor can the Court reasonably infer that Quest, Phadia, and co-conspirators held market power without further information about their market shares. The Court will, therefore, dismiss plaintiffs' § 1 claim without prejudice, permitting plaintiffs to replead with sufficient allegations.[5]

### B. Sherman Act § 2 Claim

Section 2 of the Sherman Act prohibits monopolization, attempts to monopolize, and

---

[5] The Court has additional reasons to be skeptical as to whether plaintiffs could state a cognizable § 1 claim. "Under the rule of reason, the antitrust laws protect competition, not particular competitors." *Consolid. Metal Prods., Inc. v. Am. Petrol. Inst.*, 846 F.2d 284, 292–93 (5th Cir. 1988). Plaintiffs allege (1) that Quest and Phadia excluded UAS from allergy blood-testing services and (2) coerced third-party payors and primary care physicians to avoid UAS's business. *See* Compl. ¶¶ 120–23; Pls.' Resp. 15–17. But "[t]he mere allegation of a concerted refusal to deal" will not establish antitrust liability "because not all concerted refusals to deal are predominantly anticompetitive." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985). And third-party payors and primary-care physicians still retained the power to decide whether to work with UAS—some simply chose not to. "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Grp. Ltd. v Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993). And it is "often . . . difficult" to assess whether misrepresentations or false statements "induced reliance by the consumers and produced anticompetitive effects"—particularly when the "relevant consumers are sophisticated." *Retractable Techs.*, 842 F.3d at 895. As they stand, plaintiffs' allegations may not show that the defendant's actions crossed the line between unfair and anticompetitive conduct.

16

conspiracies to monopolize "any part of the trade or commerce among the several States." 15 U.S.C. § 2. Plaintiffs have alleged a conspiracy to monopolize the allergy-testing and allergen-immunotherapy markets. *See* Compl. ¶¶ 130–31. For a conspiracy to monopolize, a plaintiff must allege: "(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307, 316 (5th Cir. 2000) (citation omitted). As with a § 1 claim, a conspiracy-to-monopolize claim requires a plaintiff to define the relevant market. *Dr.'s Hosp. of Jefferson*, 123 F.3d at 311.

Defendant Quest argues that plaintiffs' allegations amount to a "shared monopoly" theory falling outside the bounds of § 2. Mot. to Dismiss 13–15. The Court agrees. Plaintiffs have alleged that Quest, Phadia, and board-certified allergists conspired to share monopoly power over the market for "allergy testing and immunotherapy." *See, e.g.*, Compl. ¶¶ 28, 35, 42, 121, 128–33. But "[t]he very phrase 'shared monopoly' is paradoxical; when a small number of sellers dominates a market, this typically is described as an oligopoly." *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013). "In enacting the prohibitions on monopolies, Congress was concerned about 'the complete domination of a market by a *single* economic entity,' and therefore did not include 'shared monopolies' or oligopolies within the purview of [§] 2." *Id.* (quoting *Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 391 (D. Md. 1990)). Most courts to consider the issue have concluded that a "shared monopoly" cannot support a § 2 claim. *See, e.g., Midwest Gas Servs., Inc. v. Ind. Gas Co., Inc.*, 317 F.3d 703, 713 (7th Cir. 2003) (noting that "a § 2 claim can only accuse one firm of being a monopolist"); *Rebel Oil Co.*, 51 F.3d at 1443 (explaining that "[a]n oligopolist lacks [the] unilateral power" to "control

17

market output and exclude competition"); *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 291 n.1 (2d Cir. 1983) (highlighting that a claim that two defendants "together attempted to or did monopolize" a market "would be one of oligopoly under § 1 rather than of monopoly under § 2"). This consensus convinces the Court—plaintiffs' shared-monopoly allegations do not plausibly state a § 2 claim.[6]

### C. Texas Free Enterprise and Antitrust Act Violations

Plaintiffs also alleged state-law antitrust claims under the Texas Free Enterprise and Antitrust Act ("TFEAA"). Tex. Bus. & Comm. Code § 15.01 *et seq.* Because the TFEAA is modeled after the Sherman Act, Texas courts interpret its provisions "in harmony with federal judicial interpretations of equivalent federal laws." *Apani Sw.*, 300 F.3d 620; *see also DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990) (interpreting § 15.05(a) in accordance with Sherman Act § 1); *Caller–Times Publ'g Co. v. Traid Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) (interpreting § 15.05(b) in tandem with Sherman Act § 2). Because plaintiffs have not plausibly alleged § 1 or § 2 claims under the Sherman Act, their TFEAA claims must be dismissed as well.

### D. Misappropriation of Trade Secrets

Finally, plaintiffs have not stated a plausible trade-secrets claim. Under the Texas Uniform Trade Secrets Act ("TUTSA"), an individual acts unlawfully by acquiring a "trade secret" when she "knows or has reason to know that the trade secret was acquired by improper means." Tex.

---

[6] The shared-monopoly allegations also overlook plaintiffs' alleged markets. As the Court has explained, the markets for allergy testing and allergen immunotherapy are separate and distinct. *See* Part III.A.i, *supra*. Yet plaintiffs' coterie of villains includes (1) an allergy-test manufacturer, (2) an allergy-test consumer and service provider, and (3) board-certified allergists who both refer patients for allergy tests and administer allergen immunotherapy. Plaintiffs do not allege that this conspiracy sought to consolidate power in one entity. Rather, they allege "joint monopoly power in those markets" by these alleged miscreants. Compl. ¶ 129. To the extent that plaintiffs argue that Quest, Phadia, and co-conspirators all sought to protect their own market power in these markets, their conspiracy-to-monopolize claims must fail.

Civ. Prac. & Rem. Code § 134A.002(3). A "trade secret" may include "all forms and types of information," including a "list of actual or potential customers or suppliers." *Id.* § 134A.002(6). "To constitute a trade secret, the owner . . . must have 'taken reasonable measures under the circumstances to keep the information secret[.]'" *Maxim Healthcare Staffing Servs., Inc. v. Mata*, No. 5:21-cv-1100 (XR), 2022 WL 106153, at *4 (W.D. Tex. Jan. 11, 2022) (quoting Tex. Civ. Prac. & Rem. Code § 134A.002(6)(A)).

Plaintiffs have not plausibly alleged a claim that Quest misappropriated their trade secrets—a list containing names and addresses of UAS's contracted primary care physicians. Compl. ¶ 144. A UAS representative allegedly disclosed this list to Quest "as part of confidential discussions" to allow UAS-affiliated physicians to refer patients for blood testing. Pls. Resp. 8. But the only "reasonable measure[]" plaintiffs allegedly took to keep the information secret was a confidentiality statement at the bottom of an email. *Id.*; *see* Compl. ¶ 146. A boilerplate confidentiality statement does not constitute a reasonable measure to keep secrecy—especially when UAS used the phrase "*may* contain information that is . . . confidential." Compl. ¶ 146; *see, e.g.*, *Sortiumusa LLC v. Hunger*, No. 3:11-CV-1656 (BML), 2013 WL 11730655, at *11, *37 (N.D. Tex. Mar. 31, 2013) (noting that a confidentiality statement in an email footer "only suggests that there is a possibility that information contained in a given e-mail is confidential"); *Baxter & Assocs., L.L.C. v. D & D Elevators, Inc.*, 2017 WL 604043, at *10 (Tex. App.—Dallas 2017, no pet.) (denying trade-secret protection when a "customer list" was "not encrypted or protected" by software and "not labeled as confidential or proprietary"). Without a plausible allegation of a trade secret, plaintiffs' trade-secret claim fails.

## IV. CONCLUSION

For the above-mentioned reasons, plaintiffs have failed to plausibly allege violations of the Sherman Act, the TFEAA, and the TUTSA. Plaintiffs' complaint shall be **DISMISSED** without prejudice. The Court will enter a separate order this date consistent with this memorandum opinion.

Date: March 31, 2022

Royce C. Lamberth
United States District Judge